[No. S066377. June 28, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK MANUEL ABILEZ, Defendant and Appellant.

474

---

COUNSEL

Russell S. Babcock, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**WERDEGAR, J.**—A jury in Los Angeles County Superior Court convicted Frank Manuel Abilez in 1997 of the first degree murder of his mother, Beatrice Abilez Loza (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), forcible sodomy (§ 286, subd. (c)), first degree robbery (§ 211), two counts of first degree burglary (§ 459) and grand theft of a vehicle (former § 487h, subd. (a); see now § 487, subd. (d)). The jury also sustained special circumstance allegations that Abilez committed a murder while engaged in the commission of a robbery, sodomy and burglary. (§ 190.2, former subd. (a)(17)(i), (iv) & (vii); see now subd. (a)(17)(A), (D) & (G).) In addition, the jury sustained an allegation that defendant caused great bodily injury to a person over 60 years of age. (§ 1203.09, subd. (a).) Defendant waived a jury for determination of his prior convictions, and the trial court sustained allegations that he had suffered two prior serious felony convictions (§ 667, subd. (a)(1)), had previously served four separate terms in prison for felony convictions (§ 667.5, subd. (b)), and had suffered two prior felony convictions within the meaning of the "Three Strikes" law (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)). On October 16, 1997, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).) We affirm.

I. GUILT PHASE

A. *Facts*

Beatrice Abilez Loza (Loza), 68 years old at the time of her murder, lived in La Puente. She had 10 children, including defendant, although he was

raised by someone else. Two of her other children, Susie Carlon (Carlon) and John "Chachi" Loza (Chachi), lived with her, each in a separate bedroom. The victim often allowed family members to use her spare bedroom. On March 14, 1996, defendant and Loza's nephew, Albert Vieyra (Vieyra), were staying in the spare bedroom, but Loza quarreled with them and told them to leave the next day. Carlon recalled that on March 15, defendant left the house around 8:30 or 9:00 a.m. She left the house around noon to go to Stateline, Nevada, with her friend Annette Jordan; at that time, she saw defendant returning to the house.

Another of Loza's children, Johnny Garcia, lived a short distance away, and on March 15 he came by the house around 5:00 p.m. to borrow some money from his mother. He stayed 15 or 20 minutes. At that time, he noticed Loza's car was in the driveway, which was normal because his mother never put the car in the garage. When he left, Loza and Chachi were the only ones in the house. As he often did, Garcia called his mother that night around 10:45 p.m. to ensure she was "safe and okay." Concerned when she did not answer her telephone, he went to her house. Her car was not in the driveway and the outside light was turned off, both of which were unusual. When no one responded to his knocking and ringing the doorbell, he entered the house through a window. Once in the house, Garcia noticed the door to Carlon's bedroom was broken. Finding the door to his mother's room locked, he sought out his brother Chachi. Chachi, surprised on seeing his brother in the house, told Garcia their mother was in her room. Garcia then forced open a window to his mother's bedroom and entered, finding her lying facedown in the room with a sock knotted around her neck. Her pants had been pulled down and her shirt pulled up. Garcia called the police from the bedroom; he later determined the telephone in the kitchen had been pulled from the wall and that Loza's car was missing.

James Ribe, a medical examiner for Los Angeles County, conducted an autopsy on the victim and concluded she died of "asphyxia due to ligature strangulation." In addition, Ribe found evidence of "forcible rectal insertion" occurring while she was still alive. A criminalist later determined the presence of spermatozoa in the victim's rectum, but the amount was insufficient to conduct a DNA test.

Leonard Mercado, apparently one of defendant's acquaintances, testified that late in the evening of March 15, 1996, defendant and Vieyra drove up to a house in La Puente and asked whether anyone wanted to buy any of the electronic equipment they had in the car. Around 3:00 a.m. the morning of March 16, Colton Police Officer Kenneth Kiecolt stopped the car defendant was driving for having a broken license plate light. Vieyra was a passenger in the car. A license plate check indicated the car was wanted by the Los

Angeles County Sheriff's Department, so Officer Kiecolt arrested both defendant and Vieyra and had their car impounded.

After Colton Police transferred custody of defendant and Vieyra to the Los Angeles Sheriff's Department, Deputy Sean Harold secretly recorded them in the back of his car. Although much of the tape is unintelligible, one person could be heard to say in Spanish: "No, don't say anything." At another point, someone says: "Just say we were lost on the freeway." Someone also says: "No, but we left and that's it." It could not be determined who said what.

When arrested, Vieyra had scratches and abrasions on his face. A shirt, determined to belong to Vieyra, was recovered from the car; because it was stained, it was sent for analysis. A criminalist later determined the stain was from Vieyra's blood. Police also found empty beer cans and a red pajama top in the car. Loza would not have left beer cans in her car and, in fact, did not drink. The red pajama top belonged to Carlon and had been taken from her room.

Chachi, Loza's son who resided with her, had previously suffered an accident and was physically disabled at the time of trial. He testified initially that on the night in question, both defendant and Vieyra were in the victim's bedroom arguing with her. He later clarified that he heard only defendant in the room, which was consistent with his statement to the police who investigated the crime. From his bedroom, Chachi heard someone opening and closing drawers in his mother's bedroom.

When Carlon learned of her mother's murder, she returned home. She found the lock on her bedroom door had been broken and her bedroom ransacked. Missing were a compact disc player, a case with about 60 discs inside, a cassette tape player and her wallet. Stereo equipment was also missing from Loza's bedroom.

Candina Bravo, defendant's niece, testified defendant came to her home around 4:00 p.m. on March 15, 1996, to borrow money, but she had none to give him. She recalled that sometime in the two weeks before Loza's death, defendant told her: "I hate that fucking bitch. She keeps fucking with me." A couple of months before that, he told her: "I hate that fucking bitch. I want to kill her." Bravo said defendant's antipathy stemmed from the fact Loza raised her other nine children but "gave him up." Bravo also testified that Loza kicked defendant and Vieyra out of her house because they stole from her. Annette Jordan, Carlon's friend, testified she had been to the victim's home hundreds of times and confirmed that defendant and the victim argued about his eviction from the house during the two weeks leading up to the murder. She also reported hearing defendant attempt to borrow Loza's car, but she never saw Loza agree to lend it.

Gabriel Arce, the teenage son of defendant's girlfriend, testified that sometime before the murder, he heard defendant say that when Loza would not give him money, defendant would just take money from her purse, and that he wanted to kill her. Rachel Arce, defendant's sometime girlfriend, also testified defendant hated his mother.

Codefendant Vieyra testified in his own defense. He testified that on the day in question he ran into defendant, his cousin, in the parking lot of a shopping center. Defendant appeared to be under the influence of heroin and was holding a quart bottle of beer, which he proceeded to drink that afternoon. Defendant told Vieyra he was angry at his mother. They went together, first to a friend's house and then to the victim's home, arriving around 3:40 p.m. After staying a short time, they went to a corner store where they bought and consumed two 12-ounce beers. After running some errands in the neighborhood, the two returned to Loza's house. At that time, only Loza and Chachi were home. Vieyra noticed defendant was having an argument with Loza. Vieyra convinced defendant to leave, and they went to a bar, although they did not have anything to drink. The two then returned to Loza's house sometime after 5:00 p.m. Defendant went to his mother's bedroom, and Vieyra went to the bathroom to shave; at that time, he saw defendant in Loza's room and they were talking. When Vieyra was finished shaving, he heard Chachi come out of his room. Chachi called out his mother's name. Defendant came out of Loza's room and told Chachi to go back into his room. Defendant then reentered Loza's bedroom and closed the door. Vieyra went to wait in the living room.

When defendant did not emerge from Loza's room for some time, Vieyra went and opened the door. He saw Loza lying on the floor on her stomach, with defendant sitting on her, straddling her "like on a horse." Defendant held a white cloth in his hands and it was around her neck; Vieyra heard a noise from her throat. Vieyra stood there a few seconds and then returned to the living room because he was scared. Less than two minutes later, defendant emerged from Loza's room and said "estuvo," which is slang for "it is done."

Defendant then went to Carlon's room and, finding it locked, banged on the door until it opened. Vieyra helped defendant take items out of the house and load them into Loza's car. He did not know who pulled the telephone from the wall. After loading the car, they drove to a friend's home and unsuccessfully tried to sell the stolen property. They then stopped at another house, which defendant entered and did not come out of for 20 minutes. When he emerged, they moved all the items taken from Loza's home into the house. Defendant said he had received $120 for the stolen goods. They made a few more stops, but Vieyra fell asleep, possibly because he had snorted some heroin. Vieyra admitted that when he fell asleep, he urinated on

himself. He took his shirt off because it had become soiled, and as they drove off, defendant began hitting him in the face as punishment for urinating in the car, causing the scratches on his face the police later observed.

Vieyra testified that on the day of the murder, before he and defendant returned to Loza's house, defendant told him he wanted to kill Loza because she had called his adoptive mother a "puta," Spanish for "whore." Vieyra did not think defendant was serious because he had made comments like that in the past. When he encountered defendant in jail after their arrests, he asked him if he felt remorse for what he had done; defendant replied: "No, what for?"

Vieyra testified he had been "very close" to his aunt, was upset about what had happened to her, and had volunteered to take a blood or saliva test to clear himself of the sodomy charge. He conceded he did not do anything to help Loza and that he had lied to police when initially questioned. He decided to tell the truth because of his conscience. He admitted to having suffered convictions for crimes of moral turpitude in 1985 and 1991.

In his defense, defendant called Dr. Martin Porcelli, who explained the effect chronic alcohol abuse and heroin use can have on cognitive function. Defendant did not testify at the guilt phase of his trial.

For his participation in the crimes against Loza, the jury convicted codefendant Vieyra of robbery, two counts of burglary, and grand theft auto, but only second degree murder. The jury acquitted him of forcible sodomy.

### B. *Pretrial Issues*

#### 1. *Defendant's* Marsden *Motion*

Defendant contends the trial court abused its discretion by failing to grant his motion to relieve his attorney and appoint new counsel. (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*).) As we explain, the trial court did not abuse its discretion.

##### a. *Facts*

Defendant moved on September 18, 1997, to relieve his appointed trial attorney, Antonio Bestard, and have new counsel appointed. After closing the hearing, the trial court heard defendant's motion, which consisted primarily of four complaints: (1) Counsel was overly concerned with convincing defendant to accept a plea bargain of life without the possibility of parole and dismissal of the sex crime charges. According to defendant, "for the last 17

months" that is all counsel talked about. (2) Counsel discussed the case with his (counsel's) teenage son. (3) Counsel was disrespectful and sarcastic. According to defendant, counsel "doesn't talk with me; he talks at me." (4) Counsel had not discussed the defense witnesses with him. Defendant admitted he did not believe counsel had failed to do anything that should have been done.

After listening to defendant's complaints, the trial court asked counsel for a response. Regarding his urging defendant to take the plea bargain offered by the prosecutor, Bestard said he thought the prosecutor's offer was "not the most generous" but that it had the advantage of striking charges related to the sexual assault on the victim, which would inure to defendant's benefit in prison as other prisoners "don't take too kindly about prisoners sodomizing women." Bestard suggested that if defendant had a "sexual jacket in state prison," he would be victimized by fellow prisoners. Although he did not say so explicitly, implicit in Bestard's discussion was that he thought defendant's prospects at trial were dim, noting that people with whom he had discussed the case were all "appalled" at the facts. The trial court made the point explicit for counsel, informing defendant: "I think what Mr. Bestard is saying to you is, look, there are significant risks in this case. There is a high danger if you take the case to trial." Defendant replied that he understood.

Regarding having discussed the case with his teenage son, counsel explained: "One night . . . I was preparing for this case and my son happened to be in my study and looked at the charges, particularly the sodomy charges, and asked about them and I said this is a guy who is being accused of sodomizing his mother and then killing her, and my son said, 'God, dad, that is really ugly' and I just shared that with [defendant] . . . to tell him that the reaction to this case particularly is one of shock." Counsel used this example to bolster his argument to defendant that the case in defense was not a strong one, explaining that he had discussed the case (without giving defendant's name) with "other lawyers, judges, public defenders, [and] probation officers," "[a]nd they are appalled at the charges, they are appalled at the factual situation."

Regarding defendant's allegation that counsel was disrespectful and sarcastic, counsel explained: "I don't believe so, but then everyone has their own sensitivity levels. I have talked to Mr. Abilez in a very straightforward, brusque manner at times and that is my personality. I told him at the beginning of this case, which I tell most defendants, is that I am not here to tell you you have got a great case. I am your sparring partner, and if I am going to be your sparring partner, I am going to take my best shots at you, because the district attorney is going to be twice as hard on you and I want to make sure that you understand, so I am very critical of things that Mr. Abilez

has said." Counsel's assertion that he was "very critical of things" was an apparent reference to defendant's claim that he had been an altar boy at St. Margaret's Catholic Church and had been in the Cub Scouts. Counsel told the court that he had investigated both claims for potential mitigating evidence and found no evidence to support either one.

Finally, regarding defendant's claim that counsel had failed to discuss the defense witnesses with him, counsel admitted that defendant "has mentioned witnesses to me and I told him to talk to Mr. Royce who is the investigator. [Defendant] asked me to talk to witnesses. I don't talk to witnesses and the reason for that is that I don't like to be called to the stand [by the prosecutor], so I . . . have Mr. Royce talk to them and then we—we take it from there." Counsel continued: "I mentioned all these witnesses. If [defendant] has any others that we haven't gotten to, I would like to know who they are." Counsel averred that defendant "knows of the witnesses that we have been talking to. In fact, not only did I see him last night, but Mr. Royce saw him last night, too, to discuss this case." When the trial court asked defendant whether he had had an opportunity to discuss the witnesses with the defense investigator and whether "he provided you with information regarding what he has learned from the witnesses," defendant answered in the affirmative.

After hearing from both defendant and defense counsel, the trial court denied the *Marsden* motion, explaining to defendant: "Well, it does appear to me that there are some conflicts which have developed between counsel and the defendant, but frankly, in the court's view, they are the sort of conflicts that I would expect in a situation which is high-tension, high-stress, high-anxiety, and not the sort of thing that I believe would warrant granting the motion. [¶] . . . I don't think that Mr. Bestard has done anything that would be detrimental to your case. On the contrary, I think he has very aggressively pursued your defense in all aspects. [¶] I think that there may be some tension as a result of the communication, but I think ultimately you are better off with a lawyer that tells you like it is than one who tells you what you want to hear until it is too late." Also: "I don't see that there has been a breakdown in the relationship between the two of you of such a kind that would make it impossible for [counsel] to represent you in this case." The court then denied defendant's *Marsden* motion.

### b. Marsden

■ "Defendants in capital cases often express dissatisfaction with their appointed counsel, affording us ample opportunity to address the contours of the rule set forth in *Marsden, supra*, 2 Cal.3d 118. The rule is well settled. ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must

permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' (*People v. Fierro* (1991) 1 Cal.4th 173, 204 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would 'substantially impair' the defendant's right to effective assistance of counsel." (*People v. Roldan* (2005) 35 Cal.4th 646, 681 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

Defendant presents no issue that counsel was failing to provide adequate legal representation. Indeed, there was considerable evidence that counsel's investigator had been active on the job and that counsel had prepared three full binders of trial material, including a 110-page synopsis of his investigator's work. Although defendant now argues there was no "verification" counsel had in fact completed such work, the trial court was entitled to accept counsel's description of the amount of work he had completed. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245 [131 Cal.Rptr.2d 468, 64 P.3d 762].) Moreover, although defendant disputed counsel's claim they had met for one hour and 35 minutes in the week preceding the hearing on the *Marsden* motion, claiming they had met for only 45 minutes, the discrepancy is de minimis.

Defendant similarly fails to establish that the trial court's inquiry into his complaint was deficient. The record demonstrates the court allowed defendant to explain the reasons for his dissatisfaction with counsel and permitted counsel to respond. Nor has defendant demonstrated an irreconcilable conflict had developed. Counsel had adequate explanations for all of defendant's complaints, and " '[t]o the extent there was a credibility question between defendant and counsel at the hearing, the court was "entitled to accept counsel's explanation." ' " (*People v. Jones, supra,* 29 Cal.4th at p. 1245.) Defendant was given "full opportunity to air all of his complaints, and counsel to respond to them." (*People v. Smith* (2003) 30 Cal.4th 581, 606 [134 Cal.Rptr.2d 1, 68 P.3d 302].) We perceive no abuse of discretion.

Defendant now raises several additional reasons to support his claim that the trial court abused its discretion by denying his *Marsden* motion, but none has merit. He first argues the trial court improperly denied his motion by relying solely on its courtroom observations of defense counsel, without permitting defendant to relate the basis for his unhappiness. (*People v. Barnett*

(1998) 17 Cal.4th 1044, 1091 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Hill* (1983) 148 Cal.App.3d 744, 753 [196 Cal.Rptr. 382].) The record belies this claim. The trial court gave defendant ample opportunity to explain the basis of his unhappiness and then denied the motion based in part on counsel's explanations of his conduct.

Second, defendant argues he could no longer trust Bestard, noting he had breached confidentiality by discussing the case with his son and by discussing a plea offer with defendant while the prosecutor was on the speakerphone listening in; he had suggested he thought defendant was untruthful; and he had prejudiced the court by characterizing defendant as a gang member. We disagree. Counsel adequately explained the circumstances concerning his son, and the incident with the prosecutor on the speakerphone was also aired, revealing it to be an apparently routine plea negotiation and not a breach of lawyer-client confidentiality. Counsel's suggestion that defendant was untruthful came when he told the court he had been working hard on the case but that defendant had sent him off on two fruitless investigations (involving defendant's alleged participation as an altar boy and as a Cub Scout). The mention of defendant's gang affiliation came during counsel's explanation that the prosecutor's offer to drop the sodomy charge was in defendant's best interest, noting that defendant's familiarity with the Mexican Mafia should confirm counsel's belief that other gang members would not look kindly on defendant's sex crime. In short, none of defendant's complaints is substantial.

 Defendant's mere allegation that he did not trust his defense attorney, without more, was insufficient to compel the trial court to replace him. "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*People v. Jones, supra,* 29 Cal.4th at p. 1246.)

Defendant's effort to support his loss of trust in Bestard by citing counsel's attempt to have him placed in solitary confinement is unavailing. Because this issue was not raised until after the trial court had denied defendant's *Marsden* motion, it cannot be used to undermine the trial court's exercise of discretion in denying the motion. Moreover, counsel's actions were justifiable. Counsel informed the court that defendant was addicted to "pruno," an alcoholic drink brewed illicitly in county jail by inmates, and previously had come to court so intoxicated that he was unable to assist counsel. Bestard raised the possibility that defendant could be held in solitary confinement to prevent him from gaining access to any more pruno. The court declined the suggestion but ordered the bailiff to examine defendant for intoxication each time he

appeared in court. As is apparent, counsel was not irrational in exploring the possibility of having defendant held in solitary confinement nor was he trying to punish him; he was merely attempting to ensure defendant maintained sobriety so as to permit him to assist in his own defense.

Third, defendant contends three cases compel the conclusion the trial court abused its discretion by failing to grant his *Marsden* motion,[1] but all three are distinguishable. In *People v. Groce* (1971) 18 Cal.App.3d 292 [95 Cal.Rptr. 688], the defendant complained that his defense attorney had failed to obtain the hospital records that might show the extent of the victim's injuries. The appellate court reversed for *Marsden* error because the trial court had failed to inquire "into counsel's reason for not producing the physician or his hospital records." (*Id.* at p. 297.) In *People v. Hill, supra,* 148 Cal.App.3d 744, the appellate court reversed for *Marsden* error because the trial judge had failed to question counsel regarding the defendant's complaints but instead undertook its own off-the-record investigation. (*Id.* at pp. 754–755.) In *People v. Cruz* (1978) 83 Cal.App.3d 308 [147 Cal.Rptr. 740], the trial court similarly failed to ask the defense counsel to address the defendant's complaints. (*Id.* at p. 317.) In contrast to these cases, the trial court in the instant case questioned defendant about his reasons for desiring substitute counsel, asked counsel for his response and denied the motion based on the court's assessment that grounds for substitution did not exist.

In sum, we conclude the trial court did not abuse its discretion in denying defendant's *Marsden* motion. (*People v. Roldan, supra,* 35 Cal.4th at p. 681.)

### c. *Asserted federal claim*

Defendant also contends denial of his *Marsden* motion violated his right to counsel under the Sixth Amendment to the United States Constitution. Of course, the denial of a defendant's motion to substitute counsel implicates the Sixth Amendment. (*People v. Hart* (1999) 20 Cal.4th 546, 603 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Although it is unclear whether defendant preserved this federal constitutional claim at trial, we assume for purposes of argument that he did. (Cf. *People v. Partida* (2005) 37 Cal.4th 428, 435–436 [35 Cal.Rptr.3d 644, 122 P.3d 765].) "On direct review of the refusal to substitute counsel, the Ninth Circuit Court of Appeals considers 'the following three factors: "(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense." ' [Citations.] It found, and

---

[1] These cases were not cited to the trial court, but we would not expect a criminal defendant who raises a *Marsden* motion pro se to support his motion armed with such legal authority.

we agree, that these elements are consistent with California law under *People v. Marsden, supra,* 2 Cal.[3d] 118, and its progeny." (*People v. Smith, supra,* 30 Cal.4th at pp. 606–607.)

Defendant's *Marsden* motion was timely made, and as we explained, *ante,* the trial court's inquiry into the grounds of defendant's dissatisfaction with counsel was more than adequate. More importantly, the alleged conflict between defendant and his defense counsel was not so serious that we must conclude communication between them had become so poisoned defendant was effectively denied his right to counsel. These facts distinguish defendant's cited legal authority. For example, in *U.S. v. Walker* (9th Cir. 1990) 915 F.2d 480,[2] "the district court made virtually no attempt to discover the causes underlying [the defendant's] dissatisfaction with his attorney" (*Walker,* at p. 483), although the defendant " 'made a prima facie showing of an irreconcilable conflict between himself and his appointed attorney' " (*id.* at p. 484). Similarly, in *U.S. v. Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, there were "striking signs of a serious conflict" (*id.* at p. 778), yet the district court did not "ascertain the extent of a breakdown in communication by asking specific and targeted questions" (*id.* at p. 777). Finally, in *Brown v. Craven* (9th Cir. 1970) 424 F.2d 1166, the federal appellate court concluded the state court that entertained the defendant's *Marsden* motion made "no adequate inquiry into the cause of [the defendant's] dissatisfaction with his counsel" (*id.* at p. 1169).

Because the trial court here undertook a sufficiently searching inquiry into the bases of defendant's dissatisfaction with counsel, and defendant's relationship with counsel was not so irreparably damaged that he was denied the right to counsel, we reject defendant's claim the trial court's denial of his *Marsden* motion violated his federal constitutional right to counsel.

## 2. *Admonishments to Jurors During Voir Dire*

Invited to address the prospective jurors, the prosecutor, after some preliminary remarks, said: "My sole question is[,] are you sure that if we reach [a penalty phase] of this trial you can then give equal weight to the two separate penalties? That is going to be my question. [¶] . . . [¶]

"Has anyone, during the time—even during this questioning since the time you filled out these questionnaires—there is nothing wrong with saying it. If you feel comfortable outside of the presence of this group, you can say it in that manner. If you want to just say it now, if you have changed your mind,

---

[2] *U.S. v. Walker, supra,* 915 F.2d 480, was overruled on another ground in *U.S. v. Nordby* (9th Cir. 2000) 225 F.3d 1053, 1059.

do you all promise me that you will let the court know before you are sworn in as a juror, before we try this case and you hear all the evidence?

"And then we reach a certain verdict and at the penalty phase as a prosecutor I am standing and talking to a group of jurors and someone says, you know, now that I am here at the door . . . I don't want it, I can't, *I have a conscientious objection* to doing this.

"Will all of you promise me if you change your mind before you are sworn in as a juror, if you decide you cannot make that decision, will you notify the court? Does everyone agree to that?" (Italics added.)

All the prospective jurors answered in the affirmative.

The prosecutor continued: "Has anyone changed their mind? Do they feel that if we get to the penalty phase of this trial and you have to go into that jury room and sit with people and you have to make two choices, you can't say, well, my card says reserve, I could go for the lesser, I could go for that life without thing. *You have to give the weight to the evidence as the penalty phase goes.*

"Does any [juror] here feel maybe that they cannot, *they have a conscientious objection to voting for death*? Does anyone?" (Italics added.)

The jurors answered in the negative.

"But everybody does promise me if you change your mind between now and the time you are actually sworn in, you will notify the court that you have given this some thought? Everybody promises that?" The jurors answered in the affirmative.

The trial court then added: "Let me reiterate that last point and I want you to promise me if you change your mind and get to the point where you say I can't be a juror who can choose, as I said at the beginning, let me know."

Defendant contends that, by these comments, the prosecutor improperly extracted a one-sided promise from the jurors to notify the trial court if, after being selected to serve, any juror decided he or she could not vote for the death penalty, but did not similarly ask the jurors to notify the court if anyone decided he or she could not vote for life imprisonment. Defendant further contends the trial court revealed its lack of impartiality by supporting the prosecutor's statement. We disagree.

■ "It is, of course, well settled that the examination of prospective jurors should not be used ' "to educate the jury panel to the particular facts of

the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law." ' " (*People v. Fierro, supra,* 1 Cal.4th at p. 209, quoting *People v. Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869].)

At the threshold, we find defendant forfeited this claim by failing to object. (*People v. Visciotti* (1992) 2 Cal.4th 1, 47–48 [5 Cal.Rptr.2d 495, 825 P.2d 388] [failure to object forfeited challenge to prosecutorial questioning during voir dire].) To the extent defendant characterizes his claim as one of prosecutorial misconduct, we reach the same conclusion. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)[3] Although defendant correctly argues this court retains inherent discretion to entertain the issue despite this forfeiture (see *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429]), he presents no persuasive reason to do so.

Were we to address the merits of the claim, we would find no error. The prosecutor merely asked the jurors to inform the trial court if, after having filled out the juror questionnaires and undergoing voir dire, they developed a conscientious objection to the death penalty or found they could not weigh the evidence of aggravating and mitigating circumstances. He did not attempt to indoctrinate the jury or slant its perception of the appropriate penalty for the case. The prosecutor's comments were no different than defense counsel's comments, asking each prospective juror to affirm that he or she could vote for life imprisonment if the juror found the mitigating evidence outweighed the aggravating evidence.

We addressed a similar issue in *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708]. In that case, "during final stages of jury selection, the court asked the entire remaining jury panel whether anyone's 'attitude has changed toward serving on a panel that may be called upon to assess a penalty in this case.' One of the two jurors raised her hand. The second sent the court a note saying, 'After long, careful thought, I know that I could not vote for the death penalty.' Over defense objection, the court and

---

[3] We similarly reject defendant's claim that his trial counsel was ineffective for failing to object and preserve the issue for appellate review. "Failure to object rarely constitutes constitutionally ineffective legal representation." (*People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391].) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People v. Gray* (2005) 37 Cal.4th 168, 207 [33 Cal.Rptr.3d 451, 118 P.3d 496].) Here, counsel may well have declined to object so that he could mention the same issue when he addressed the jury.

parties requestioned both individually. The court excused them for cause because of their newly expressed views on the death penalty." (*Id.* at p. 358.) We found no error, explaining that much time had passed from the initial voir dire and "it was reasonable to ask if anyone's views had changed." (*Ibid.*) We find the situation in this case similar to that in *Carpenter* and accordingly find the prosecutor did not improperly indoctrinate the jury.

■ To the extent defendant contends the prosecutor's pretrial address to the jury constituted misconduct, we reject that claim as well. " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hill, supra,* 17 Cal.4th at p. 819; see *People v. Stanley* (2006) 39 Cal.4th 913, 951 [47 Cal.Rptr.3d 420, 140 P.3d 736].) Here, there was nothing deceptive, reprehensible or unfair about the prosecutor's comments to the jury, nor did he attempt to get the jury to commit to vote for the death penalty before hearing all the evidence. We conclude the prosecutor did not commit misconduct when he addressed the jury before trial.

Defendant also argues he was deprived of his constitutional rights to a fair trial, an impartial judge and "appropriate punishment" under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the court's comment "reiterat[ing]" the prosecutor's comments betrayed the court's bias in favor of the death penalty. Defendant failed to preserve a claim of judicial bias by making a timely objection (*People v. Harris* (2005) 37 Cal.4th.310, 346 [33 Cal.Rptr.3d 509, 118 P.3d 545]), nor was this the type of situation in which an objection would have been futile (*People v. Hill, supra,* 17 Cal.4th at p. 820), as the court could have clarified its remarks in response to a defense objection. In any event, as illustrated by our discussion of the issue in *People v. Carpenter, supra,* 15 Cal.4th at page 358, the claim is baseless because the trial court's comments cannot reasonably be construed either as expressing a bias in favor of the death penalty or as expecting the jury to return a death verdict.

### 3. *Excusal of Juror No. 21 for Cause*

Defendant contends the trial court's decision to excuse Juror No. 21 for cause violated his constitutional rights to an impartial jury, to due process of law and to a reliable penalty determination under the Sixth, Eighth and

Fourteenth Amendments to the United States Constitution, as well as sections 7, 15, 16 and 17 of article I of the California Constitution.

### a. *Facts*

Prior to trial, the prospective jurors filled out detailed questionnaires and the trial court and the parties conducted voir dire, questioning the prospective jurors about their views. When questioned, Juror No. 21 affirmed he would not automatically vote for life or death, would listen to the evidence and would weigh the aggravating and mitigating evidence. He apparently hesitated in answering the questions, however, prompting this exchange between the juror and the trial court:

"THE COURT: You are hesitating. I need to know why you are hesitating[.]

"[JUROR No. 21]: Well, I have to be kind of honest, the death penalty, that is kind of a gray issue with me I guess.

"THE COURT: What do you mean by that?

"[JUROR No. 21]: (No audible response.)

"THE COURT: When you say it is a gray issue, what do you mean?

"[JUROR No. 21]: Well, you know, I know the state—I am not against the state law and everything like that, but I guess with me it would—you know, it would just have to be with my own—I mean, my own convictions, I guess."

The court then asked: "I need to know . . . if you are sitting on this jury making the decision in the penalty phase, do you have some conscientious objection to imposing the death penalty that might impair your ability to be fair and impartial at that stage, that might cause you not to want to vote for the death penalty no matter what the evidence showed?" Juror No. 21 answered: "Umm, that is just kind of a hard thing for me to answer, you know."

The court then asked: "Do you believe that you could, under any set of circumstances, along with a group of eleven other people, vote to impose the penalty of death on another human being if the evidence showed that that was the appropriate penalty?" Juror No. 21 answered: "I guess I would have to say no." The court then declared a recess.

After the recess, the trial court spoke to the attorneys before the prospective jurors were recalled to the courtroom, explaining:

"THE COURT: . . . [¶] This last juror who I was questioning . . . I am less concerned with the specifics of what he is saying, although I mean what he is saying is material, but I am concerned about his mental state, his competency.

"I mean, we are talking about twenty-, thirty-second lapses in responding to questions and then I am not even sure that he is being responsive.

"I don't know how counsel feel about him, but I am not sure—it seems to me he may be somebody that we should consider for cause at this point before we go any further."

Defendant's counsel objected to removing Juror No. 21 for cause.

The court responded: "Well, he has had a questionnaire which is in some ways incomprehensible. It is filled with discussions of quasi-religious statements, man's sinful nature and rebellious[ness] towards God's commands as the cause of crime and so forth and on and on."

The court then brought the prospective jurors back into the courtroom and questioned Juror No. 21 further:

"THE COURT: Juror [No.] 21, anything further—have you thought—given any further thought to the subjects we were discussing prior to the break and do you have anything further that you would like to add regarding your feelings about the death penalty?

"[JUROR No. 21]: No, I—I guess I will just say, you know, I just have a problem with it.

"THE COURT: Okay."

Later in the hearing, outside the jury's presence, the prosecutor challenged Juror No. 21 for cause, explaining: "I think [Juror No.] 21 . . . made a comment about his uncertainty on the death penalty or his failure—his unwillingness to impose the death penalty, but he said [he] did . . . have a problem with it and I interpret that to be that would prevent him or substantially impair him from returning a verdict of death in this case.

"The court had noted something about his delayed answers. I don't know if the record will reflect that, that every time every death question he was asked he hesitated, not just slow of speech, but has hesitation, because I think he was reluctant to answer, and as I get the sum and substance of him, he would not follow, if he gets in that jury room he would not be willing to impose the death penalty."

Defense counsel opposed the challenge, explaining: "[Juror No. 21] is a Christian, but he does—he doesn't have any feelings about the death penalty. He says it is not much—when he is asked about the death penalty: [¶] 'I don't have a good answer on this issue. What is important, that the condemned person receives Jesus Christ.' [¶] He may be more of a religious fanatic but he certainly doesn't say he is against the death penalty. I think his problem is he is slow. He is a lower I.Q. probably of the majority of the population that we have here in our jurors. I don't think that disqualifies him. I think he answered each and every one of the questions. There is a lot of misspelling in here which reflects probably his low education level, but I don't think that is enough to disqualify him."

The trial court granted the prosecutor's challenge for cause, explaining: "My view is that [Juror No. 21's] questionnaire was . . . evasive. I think he is slow to answer because he doesn't want to answer. I think that perhaps there may be some embarrassment, I don't know what the motive is, I can't peer into his mind, but it appears to me that from his answers that he has views that would substantially impair his ability to judge the question of the penalty and to apply the legal standard that he must apply. [¶] And therefore I am going to grant the motion to excuse him for cause."

b. *Discussion*

In *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], the United States Supreme Court set forth the applicable law for excusing jurors in capital cases due to their views on capital punishment. "That case 'requires a trial court to determine "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [Citation.] "Under *Witt*, therefore, our duty is to 'examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of [the juror's] duties . . ." was fairly supported by the record.' " [Citations.] [¶] In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' " (*People v. Roldan, supra*, 35 Cal.4th at p. 696; see *Uttecht v. Brown* (2007) 551 U.S. __, __ [167 L.Ed.2d 1014, 127 S.Ct. 2218] [emphasizing the deference owed to the trial court's ruling in this context].) " 'There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the

trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' [Citation.] 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court.' " (*People v. Gray, supra,* 37 Cal.4th at pp. 192–193.)

No abuse of discretion appears. Although Juror No. 21 initially answered the general questions about capital punishment appropriately, that changed when he was questioned more specifically, and he stated he could not vote to sentence someone to death. He affirmed that opinion after a recess had given him some time to think about his views about capital punishment. More significantly, Juror No. 21 hesitated 20 to 30 seconds before answering each question about the death penalty, which the trial court reasonably concluded was due to the juror's desire not to answer the question at all. This assessment of the juror's state of mind is binding on this court. (*People v. Roldan, supra,* 35 Cal.4th at p. 696.) In short, we find the trial court was well within its broad discretion in granting the challenge to Juror No. 21 for cause.

### 4. *Cumulative Effect of Alleged Juror Selection Errors*

We further reject defendant's claim that the cumulative effect of errors committed during jury selection prejudiced him, on the ground that the trial court did not err in admonishing the jurors or granting the for-cause challenge of Juror No. 21.

### C. *Trial Issues*

#### 1. *Exclusion of Vieyra's Prior Sex Crimes*

On learning that codefendant Vieyra intended to testify, defendant moved to admit evidence of Vieyra's prior contacts with law enforcement, characterizing them as: (1) a 1973 juvenile adjudication for forcible rape; (2) a 1977 arrest for unlawful sexual intercourse with a minor; (3) 1986 arrests for unlawful intercourse and sexual battery, apparently for the same incident, which charges were dismissed; and (4) a 1991 conviction for petty theft with a prior for an incident that may have involved indecent exposure. Defense Counsel Bestard asserted that these prior incidents were admissible to prove identity, that is, that Vieyra and not defendant was more likely to have been the one to sodomize the victim. The court took the matter under advisement and then issued a tentative ruling, explaining that defendant's characterization of Vieyra's prior contacts with the judicial system was inaccurate. The court stated it had "reviewed the Probation Department's pre-plea report regarding defendant Vieyra" and found only one prior conviction for a sex crime: a 1973 juvenile adjudication for attempted unlawful intercourse with a minor.

There was no indication in the record this offense involved force. Further, the court found "no evidence of any other sex crime <u>charges</u>, let alone convictions, against defendant Vieyra." The court tentatively ruled this 1973 incident was too remote to be admissible to prove identity pursuant to *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] and *People v. Balcom* (1994) 7 Cal.4th 414 [27 Cal.Rptr.2d 666, 867 P.2d 777] and noted that, although it need not reach the question whether the evidence should be excluded under Evidence Code section 352, the prior juvenile adjudication bore little resemblance to the crime in this case and "is of very little if any probative value and would create a risk of substantial prejudice to defendant Vieyra."

The parties addressed the trial court's tentative ruling at a hearing held on September 30, 1997. The court noted it "went back to the probation pre-plea report and went through their history with . . . a fine tooth comb and found only one sex crime, 1973." Defense Counsel Bestard asserted that he had "indicated to the court that most of these were arrests and police reports on the subject"; he did not, at that time, seek to introduce any evidence suggesting any other law enforcement contacts Vieyra may have had that involved sexual crimes. Bestard then argued the evidence was nevertheless admissible to rebut Vieyra's evidence of good character, as impeachment and to prove identity.

The trial court explained: "We have got a single conviction which is not enough under [Evidence Code section 1101, subdivision (b)] to establish any of the grounds for admissibility that would be permitted by the California Supreme Court, and as I indicated, I don't think it even gets to [Evidence Code section] 352 [because] I don't think . . . it is enough to show intent, common scheme or plan, certainly not identity, and under Evidence Code section 1108, you still have to do [an Evidence Code section] 352 analysis even though you can now use it to prove propensity, and that just isn't there, so we are really down to the question of what can we use to impeach." The court then ruled that Vieyra could be impeached with his 1985 conviction for violating Penal Code section 273.5 (corporal injury to a spouse), as well as a 1991 prior felony conviction for theft, finding both were crimes involving moral turpitude. The trial court later affirmed its tentative ruling.

Defendant contends the trial court erred under state law by excluding Vieyra's prior contacts with law enforcement and also characterizes the error as one of federal constitutional magnitude, contending he was denied his constitutional right to present a defense. At the threshold, he argues the trial court was wrong in finding Vieyra's only contact with law enforcement was the 1973 juvenile adjudication, claiming "defense attorney Bestard was correct and the court was wrong regarding the extent of multiple sex crime

contacts." In support, defendant cites several certified documents with which the appellate record has been augmented.

The augmented documents reveal that Vieyra had multiple police contacts through the years, including several for drug abuse, spousal abuse, obstruction of justice, vehicle tampering and misdemeanor burglary. Other than his 1973 juvenile adjudication for attempted unlawful sexual intercourse with a minor, however, none of the other offenses of a sexual nature for which he was arrested led to a conviction or other disposition.[4] More to the point, nothing indicates these records were available to the trial court or were provided by defense counsel. We thus cannot conclude the trial court erred in finding Vieyra had only the one 1973 adjudication for a crime of a sexual nature.

■ Although defendant offered codefendant Vieyra's adjudication of a prior sex crime as evidence of identity, i.e., to show that it was Vieyra who sodomized and killed the victim, the trial court did not abuse its discretion in excluding the evidence under Evidence Code section 1101. The law is clear and well settled. "Evidence Code section 1101, subdivision (b) provides in pertinent part that evidence of other crimes is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than [the defendant's] disposition to commit such an act.' ' "Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]" [Citation.] In cases in which [a party] seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility "depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity." ' [Citation.] 'A somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent. (*People v. Ewoldt*[, *supra*,] 7 Cal.4th [at pp.] 402–403.) On appeal, we review a trial court's ruling under Evidence Code section 1101 for abuse of discretion.' " (*People v. Gray, supra,* 37 Cal.4th at p. 202.)

---

[4] The records show: (1) Vieyra was arrested in 1977 for lewd conduct with a minor, but was not prosecuted for that charge, although the incident may have led to a revocation of parole; (2) he was again arrested in 1986 for sexual battery and unlawful sexual intercourse, but the charges were dismissed; and (3) he was arrested in 1991 for petty theft and indecent exposure, but was sentenced for only the theft offense.

Given that Vieyra's sole sex-related conviction was a juvenile adjudication for attempted unlawful intercourse with a minor occurring more than 20 years before the trial, the trial court was rightly concerned about the remoteness of the offense. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282 [109 Cal.Rptr.2d 870] [court should evaluate the "remoteness in time of the uncharged offenses"].) Although defendant argues the remoteness of the 1973 adjudication was mitigated by the fact Vieyra was incarcerated for much of his adult life, the records actually show he was in and out of custody often enough to accumulate an impressive number of arrests and other police contacts through the intervening years. Thus, despite Vieyra's time in custody, the trial court was legitimately concerned with the remoteness of the adjudication.[5]

■ Apart from the age of the prior adjudication, another more compelling reason exists to support the trial court's decision: Vieyra's prior juvenile offense appears completely different from those of the crime here, namely, the sodomizing and murder of an older woman. " 'For identity to be established, the uncharged misconduct and the charged offense must share common features that are *sufficiently distinctive* so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403.) 'The highly unusual and distinctive nature of both the charged and uncharged offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense.' (*People v. Balcom*[, *supra,*] 7 Cal.4th [at p.] 425.)" (*People v. Gray, supra,* 37 Cal.4th at p. 203, italics added.) Because the prior crime, though sexual in nature, was so different from the present crime, the inference that the person who attempted to have sex with a minor more than 20 years earlier was likely to be the person who sodomized and killed the 68-year-old victim here is weak. We would reach the same conclusion even if we considered Vieyra's past arrests for attempting to have sex with minors and indecent exposure. Accordingly, the trial court did not abuse its discretion under Evidence Code section 1101 by excluding evidence of Vieyra's past sex-related criminal activity, which defendant offered to prove identity.

■ We reach a similar conclusion with regard to Evidence Code section 1108. Subdivision (a) of that section provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

---

[5] Although defendant argues the trial court erred in excluding the evidence on grounds of remoteness because the evidence was admissible at the penalty phase, the trial court excluded it only for the guilt phase and defendant remained free to seek its admission at the penalty phase.

Regarding the purpose of this section, we explained in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 [89 Cal.Rptr.2d 847, 986 P.2d 182], that "the Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases." Moreover, "[a]vailable legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints [Evidence Code] section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility. In this regard, section 1108 implicitly abrogates prior decisions of this court indicating that 'propensity' evidence is per se unduly prejudicial to the defense." (*Ibid.*)

Addressing Evidence Code section 1108, *Falsetta* explained: "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible *remoteness*, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, *its similarity to the charged offense*, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta, supra,* 21 Cal.4th at p. 917, italics added.)

As the trial court found when ruling on the Evidence Code section 1101 question, the lack of similarity between Vieyra's 1973 adjudication and the present crimes justified exclusion of the evidence. This conclusion is bolstered by the remoteness of the 1973 adjudication. We cannot say the trial court abused its discretion in excluding the 1973 juvenile adjudication as proof of Vieyra's propensity, especially when we consider the court permitted his impeachment with two prior crimes of moral turpitude. The jury was thus not unaware of his checkered past.

We also reject defendant's subsidiary claim that the trial court erred in excluding the evidence because it comprised evidence of third party culpability. Although defendant is correct that he has a right to present evidence that some other person committed the crime for which he is charged,[6] he overlooks that such evidence must be otherwise admissible. He cites no authority, and we have found none, holding that the right to present evidence of third party culpability allows admission of otherwise inadmissible evidence. As we have concluded the trial court did not abuse its discretion in excluding the evidence under Evidence Code sections 1101 and 1108, we

---

[6] We address the issue of third party culpability, *post,* in part I.C.4.c.

reject the claim defendant was entitled to present inadmissible evidence suggesting Vieyra sodomized and killed the victim.

Having found no state law error, we also reject defendant's federal constitutional claim. Citing *Washington v. Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920], *Webb v. Texas* (1972) 409 U.S. 95 [34 L.Ed.2d 330, 93 S.Ct. 351], *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], and other cases from the high court, defendant contends the exclusion of Vieyra's past sex-related juvenile adjudication and arrests for similar crimes violated his federal constitutional right to present a defense. Defendant's argument fails to account for the general rule that the application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial. (*People v. Lawley* (2002) 27 Cal.4th 102, 155 [115 Cal.Rptr.2d 614, 38 P.3d 461].) As one appellate court observed: "Preventing and dealing with crime is more the business of the states than of the federal government. Accordingly, the state has power to regulate the procedures under which its laws are carried out, and a rule of evidence in this regard 'is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." [Citations.]' " (*People v. Fitch* (1997) 55 Cal.App.4th 172, 178–179 [63 Cal.Rptr.2d 753], quoting *Patterson v. New York* (1977) 432 U.S. 197, 201–202 [53 L.Ed.2d 281, 97 S.Ct. 2319].)

This general rule will give way in extraordinary and unusual circumstances, but such was not the case here. In this case, defendant was able to impeach Vieyra with some of his prior crimes, but was not allowed to present evidence of Vieyra's more-than-two-decades-old sex crime. We cannot say the excluded evidence was "so vital to the defense that due process principles required its admission. [Citations.] Although the high court in *Chambers* determined that the combination of state rules resulting in the exclusion of crucial defense evidence constituted a denial of due process under the unusual circumstances of the case before it, it did not question 'the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.' (*Chambers v. Mississippi, supra,* 410 U.S. at pp. 302–303.)" (*People v. Cornwell* (2005) 37 Cal.4th 50, 82 [33 Cal.Rptr.3d 1, 117 P.3d 622].) The exclusion of evidence in this case under Evidence Code sections 1101 and 1108 was a garden-variety evidentiary issue under state law and did not implicate defendant's federal constitutional right to present a defense. The trial court's discretionary ruling excluding the evidence did not violate defendant's constitutional right to present a defense.

## 2. *Alleged Insufficient Evidence*

Defendant contends his felony convictions for murder, robbery, sodomy, burglary and grand theft, as well as all the special circumstance allegations, are not supported by sufficient evidence. The law is clear and well settled. "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].) The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996].) 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' (*Id.* at pp. 932–933.) ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

### a. *Murder, sodomy and sodomy-murder special circumstance*

Defendant contends his convictions for murder and forcible sodomy and the sodomy-murder special-circumstance finding must be reversed for insufficient evidence because they are based solely on the uncorroborated testimony of codefendant Vieyra, an accomplice. Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Accordingly, the jury was instructed: "You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence that tends to connect such defendant with the commission of the offense." The jury was further instructed: "To corroborate

the testimony of an accomplice as to the guilt of a codefendant, there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged. [¶] However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged or that it corroborate every fact to which the accomplice testifies."

▇▇▇ The instructions accurately reflect the applicable law. "The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 986 [123 Cal.Rptr.2d 654, 51 P.3d 874]; see *People v. Gurule* (2002) 28 Cal.4th 557, 628 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Thus, to the extent defendant argues that evidence corroborating Vieyra's testimony must be substantial, he is mistaken.

There is no doubt the victim was sodomized and killed. Vieyra testified he was with defendant when defendant fought with the victim. He claimed he opened the door and saw defendant straddling his mother on the floor and saw a white cloth around her neck. A few minutes later, defendant emerged from the bedroom and told Vieyra "estuvo" ("it is done"). The two of them then took several items from the victim's room, loaded them into her car and went to sell them. Vieyra claimed that, prior to the crime, he heard defendant express his desire to kill his mother because she had given him up to be raised by someone else when he was a child.

Although defendant concedes the victim was sodomized and killed, he contends that apart from Vieyra's uncorroborated testimony, there was no evidence identifying him as the assailant. We disagree. All the critical aspects of Vieyra's testimony were corroborated. Police found the victim with a white sock wrapped tightly around her neck. Chachi, one of victim Loza's children who lived with her, testified that on the evening of March 15, 1996, defendant and Vieyra came to see Loza. Chachi heard defendant and Loza arguing and heard Loza scream. Later, he heard someone start Loza's car and drive off. Both Candina Bravo and Gabriel Arce testified that, in the days

before the murder, they heard defendant state he wished to kill the victim. This evidence corroborates Vieyra's testimony on the issue of the killer's identity.

■ The authorities defendant cites in support are distinguishable. In *People v. Martinez* (1982) 132 Cal.App.3d 119, 133 [183 Cal.Rptr. 256], the purported corroborating evidence "did nothing more than show 'the commission of the offense or the circumstances thereof.' " Similarly, in both *People v. Valardi* (1966) 240 Cal.App.2d 98 [49 Cal.Rptr. 339] and *People v. Lloyd* (1967) 253 Cal.App.2d 236 [61 Cal.Rptr. 138], the only evidence tending to corroborate an accomplice's testimony was proof the defendants were present at the scene. By contrast, evidence aside from Vieyra's testimony established more than defendant's mere presence at the scene of the crime. The evidence showed he fought and argued with the victim, the manner of killing (the sock), and his preexisting desire to kill the victim. This evidence—all obtained from sources other than Vieyra—tends to prove, directly or circumstantially, that defendant was the person who sodomized and killed the victim. Contrary to defendant's suggestion, the corroborating evidence need not independently establish the identity of the victim's assailant. (*People v. McDermott, supra,* 28 Cal.4th at p. 986 ["corroborating evidence need not by itself establish every element of the crime"].)

There being ample evidence corroborating Vieyra's testimony, we find his testimony was properly admitted and provided substantial evidence identifying defendant as the person who committed the murder and sodomy. We thus reject the claim there was insufficient evidence of murder, sodomy or the sodomy-murder special circumstance.

b. *Robbery and robbery-murder special circumstance*

■ Defendant contends his conviction for robbery and the robbery-murder special-circumstance finding must be reversed for insufficient evidence, relying on several theories. First, he argues the evidence was insufficient that he formed the intent to steal before or during the application of force to the victim. (*People v. Yeoman* (2003) 31 Cal.4th 93, 129 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) We disagree. Candina Bravo testified that, just hours before the murder, defendant asked her for money. According to Gabriel Arce, defendant's practice when the victim refused his requests for money was just to take it from her purse. That defendant, immediately after killing the victim, stole several items from her home and then offered them for sale to Leonard Mercado, is also relevant circumstantial evidence of his intent at the time of the murder. "Although the evidence is circumstantial, the intent required for robbery . . . is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding

the crime." (*People v. Lewis* (2001) 25 Cal.4th 610, 643 [106 Cal.Rptr.2d 629, 22 P.3d 392].) We conclude substantial evidence supports the jury's implied finding that defendant harbored the intent to steal before or during the murder.

■ Second, defendant argues the evidence was insufficient he stole the victim's property by means of force or fear. The crime of robbery, of course, "is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished *by means of force or fear*." (§ 211, italics added.) Because the victim was already dead when he took her property, defendant argues, he cannot be found to have stolen from her "by means of force or fear." The point is meritless. ■ "[I]t is settled that a victim of robbery may be unconscious or even dead when the property is taken, so long as the defendant used force against the victim to take the property." (*People v. Jackson* (2005) 128 Cal.App.4th 1326, 1330 [27 Cal.Rptr.3d 793], citing *People v. Frye* (1998) 18 Cal.4th 894, 956 [77 Cal.Rptr.2d 25, 959 P.2d 183].) There is no requirement a victim be aware that someone was taking his or her property. (*Jackson*, at p. 1330.) It was defendant who applied the force to this victim, and substantial evidence was presented to show that he did so with the intent to steal. We thus reject his arguments.

■ Third, defendant argues there was insufficient evidence he removed the victim's property "from [her] person or immediate presence." (§ 211.) "The generally accepted definition of immediate presence . . . is that ' "[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." ' " (*People v. Hayes* (1990) 52 Cal.3d 577, 626–627 [276 Cal.Rptr. 874, 802 P.2d 376].) This element was satisfied by evidence defendant took electronic equipment from the victim's bedroom, the same location in which she was killed. Moreover, even taking her car or items from another bedroom would qualify: "The zone of immediate presence [for purposes of robbery] includes the area 'within which the victim could reasonably be expected to exercise some physical control over his property.' " (*People v. Webster* (1991) 54 Cal.3d 411, 440 [285 Cal.Rptr. 31, 814 P.2d 1273]; see *People v. Holt* (1997) 15 Cal.4th 619, 675 [63 Cal.Rptr.2d 782, 937 P.2d 213] [although victim was killed in the bedroom, items in her kitchen were in her " 'immediate presence' " for robbery purposes].)

■ We also reject as unsupported defendant's further argument that the items he took were not in the victim's immediate presence because "[a] deceased individual is no longer a person and therefore cannot have actual or constructive possession of property." To the contrary, "[w]hile it may be true

that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property." (*People v. Navarette* (2003) 30 Cal.4th 458, 499 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

In sum, we find sufficient evidence to support defendant's conviction for robbery and the robbery-murder special circumstance.

### c. *Burglary and burglary-murder special circumstance*

 Defendant contends his two convictions for burglary and the burglary-murder special-circumstance finding must be reversed for insufficient evidence. He relies on two theories. First, he argues the evidence was insufficient that he formed the intent to steal before he entered either the victim's home, her bedroom or Carlon's bedroom. We disagree. Intent to steal is often proved by circumstantial evidence (*People v. Johnson* (1993) 6 Cal.4th 1, 36 [23 Cal.Rptr.2d 593, 859 P.2d 673], overruled on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879 [48 Cal.Rptr.3d 1, 141 P.3d 135]), and this case is no different. Here, substantial evidence showed defendant intended to commit a theft-related offense at the time he entered his mother's home. Candina Bravo testified defendant asked her for money shortly before the crimes and that defendant had, in the past, clashed with his mother over money. Defendant's possession and subsequent sale of goods stolen from the victim's home shortly after the crimes is strong circumstantial evidence that he harbored the intent to commit larceny when he entered her home. (*People v. Yeoman, supra*, 31 Cal.4th at p. 131.) Moreover, "[t]here is no better proof that [defendant] entered the [victim's house] with intent to commit robbery than a showing he did in fact commit robbery after his entry." (*People v. Du Bose* (1970) 10 Cal.App.3d 544, 551 [89 Cal.Rptr. 134].)

Second, defendant contends that because he lived with the victim, there was insufficient evidence of burglary because one "cannot be guilty of burglarizing his own residence." He is correct as a general matter (*People v. Davis* (1998) 18 Cal.4th 712, 721 [76 Cal.Rptr.2d 770, 958 P.2d 1083]; *People v. Gauze* (1975) 15 Cal.3d 709 [125 Cal.Rptr. 773, 542 P.2d 1365]), but even assuming he lived with the victim, the charge was not limited to entry into the victim's home. The second amended information charged defendant in count 4 with entering "an inhabited dwelling house . . . and inhabited *portion of a building* occupied by BEATRICE LOZA." (Italics added.) It similarly charged him in count 5 with entering "an inhabited dwelling house . . . and inhabited *portion of a building* occupied by SUZIE [*sic*] CARLON." (Italics added.) The wording of the information is consistent with section 459, which provides in pertinent part: "Every person who enters

any house, *room*, apartment, . . . or other building . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (Italics added.)

With regard to count 4, we conclude there was sufficient evidence defendant burglarized his mother's bedroom. Although the victim may have permitted defendant to be in her home, a point we need not resolve,[7] defendant fought with the victim in her bedroom, causing her to scream. When Chachi came to see what was happening, defendant told him to return to his room. Defendant then reentered the victim's bedroom. The jury could have concluded that, under the circumstances, defendant at that time lacked the victim's consent to enter her bedroom; that he may have had a possessory right to enter the home does not preclude a conviction for burglary on these facts. (See *People v. Frye, supra,* 18 Cal.4th at p. 954.)

With regard to count 5, Carlon testified that on returning to the house, she found the lock on her bedroom door had been broken and her electronic equipment had been stolen. Consistent with her testimony, the prosecutor argued that "the minute someone went into Susie Carlon's bedroom with the intent to steal from her, they are guilty of burglary." As defendant broke into Carlon's locked bedroom and stole her electronic equipment, that he may have lived in the house is immaterial. (*People v. Wilson* (1989) 208 Cal.App.3d 611 [256 Cal.Rptr. 422] [invited guest who, without permission, breaks into a locked bedroom commits burglary], cited with approval in *People v. Sparks* (2002) 28 Cal.4th 71, 81 [120 Cal.Rptr.2d 508, 47 P.3d 289].)

We thus conclude the evidence was sufficient to support both counts of burglary. That being so, we also reject defendant's claim there was insufficient evidence to sustain the burglary-murder special circumstance. To the extent he claims our interpretation of the law of burglary renders the special circumstance unconstitutionally broad, such that it fails to perform the constitutionally required narrowing function, we reject that as well. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1095 [119 Cal.Rptr.2d 859, 46 P.3d 335] [§ 190.2 not unconstitutional "because of the breadth of the felony-murder special circumstance"].)

---

[7] Evidence was presented indicating the living arrangements at the victim's home were somewhat fluid. At the time of the crimes, she was allowing defendant and Vieyra to sleep in her spare room, although she asked defendant to leave because she believed he had stolen money from her. He had previously lived in the house and had previously been asked to leave. He did not have a key to the house.

#### d. *Grand theft of a vehicle*

Defendant contends his conviction for grand theft of a vehicle must be reversed because there was insufficient evidence to show that he intended to "steal" the car, i.e., that he intended permanently to deprive the victim of it. We disagree.

Defendant was convicted of violating former section 487h, subdivision (a), which in 1996 provided in pertinent part: "Every person who feloniously steals or takes any motor vehicle . . . is guilty of grand theft." (Stats. 1993, ch. 1125, § 6, p. 6292; see now § 487, subd. (d).) The crime requires "the specific intent to *permanently* deprive a person of property." (*People v. Ortega* (1998) 19 Cal.4th 686, 693 [80 Cal.Rptr.2d 489, 968 P.2d 48], overruled on another point in *People v. Reed* (2006) 38 Cal.4th 1224 [45 Cal.Rptr.3d 353, 137 P.3d 184].) Contrary to defendant's argument, the evidence of his intent, though circumstantial, was strong. He killed the owner of the car and then used it to ferry his stolen goods to sell. As in *People v. Moon* (2005) 37 Cal.4th 1, 27 [32 Cal.Rptr.3d 894, 117 P.3d 591], "[t]he evidence defendant intended to deprive [the victim] of her car permanently was overwhelming, and the evidence he merely intended to drive it temporarily and then return it to her was virtually nonexistent. At the threshold, we note that defendant killed [the car's owner], indicating he did not intend to return the car to her."

Defendant asserts evidence the victim allowed him to drive the car and had, in fact, loaned it to him the very day of her murder demonstrates that he had permission to drive the car. The evidence, coming from defendant himself, was not adduced until the penalty phase of the trial, however, and thus was not before the jury at the guilt phase. In any event, even by defendant's own account, he did not have permission to still be driving the victim's car when he was arrested after midnight. Coupled with evidence he killed the car's owner, we conclude there was sufficient evidence defendant did not intend to return the car to her.

#### e. *Felony-murder special circumstances*

In his final argument addressing the alleged insufficiency of the evidence, defendant contends the evidence was insufficient to prove he killed the victim "while . . . engaged in" the three target felonies of robbery, sodomy and burglary. Section 190.2, subdivision (a) provides the penalty for first degree murder is either life imprisonment without possibility of parole, or death, "if one or more of the following special circumstances has been found . . . to be true: [¶] . . . [¶] (17) The murder was committed *while the defendant was engaged in*, or was an accomplice in, the commission of,

attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: [robbery, sodomy, burglary]." (Italics added.) The information charged defendant in this language, the jury was so instructed, and the verdict reflects this language.

■ "[A] felony that is merely incidental to the murder cannot serve as the basis for a felony-murder special circumstance" (*People v. Gurule, supra*, 28 Cal.4th at p. 628), for the Legislature's goal in implementing the death penalty law by enacting the special circumstance scheme would not be achieved if a criminal defendant could be made eligible for the death penalty where his intent is not to commit an enumerated felony but is instead simply to kill, and the associated felony was "merely incidental to the murder." (*People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].)[8] For example, a killer who takes the victim's clothes so as to forestall later identification of the victim and thus avoid responsibility for the murder (*Green*, at p. 61) or a rapist-killer who takes a letter from his victim as a remembrance of his rape (*People v. Marshall* (1997) 15 Cal.4th 1, 41 [61 Cal.Rptr.2d 84, 931 P.2d 262]) have not committed murder "while engaged" in their felonies. ■ For those who kill, however, we need not discern their various mental states in too fine a fashion; a "concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance." (*People v. Barnett, supra*, 17 Cal.4th at p. 1158.)

We conclude sufficient evidence exists to show defendant killed the victim "while . . . engaged in" the commission of robbery and burglary. Evidence demonstrated that, on the day of the murder, defendant was in need of money, having asked Candina Bravo for some. The victim had asked defendant to leave her home because he had stolen money from her. Immediately after the victim was killed, defendant and Vieyra took electronic equipment from her bedroom and loaded it into her car. They then broke the lock on Carlon's bedroom, entered and removed more electronic equipment. They took the victim's car without permission and proceeded to sell the stolen goods. This behavior was not incidental or ancillary to the murder, but amply demonstrates an independent felonious purpose in support of the robbery- and burglary-murder special circumstances.

■ We also conclude sufficient evidence exists to show defendant killed the victim "while . . . engaged in" the commission of sodomy. Defendant expressed to several witnesses his anger at, and hatred of, the victim, his biological mother, for abandoning him and then denigrating the woman who raised him. The jury could reasonably have inferred from this evidence that

---

[8] *People v. Green, supra*, 27 Cal.3d 1, was overruled on other points by *People v. Hall* (1986) 41 Cal.3d 826, 834, footnote 3 [226 Cal.Rptr. 112, 718 P.2d 99], and *People v. Martinez* (1999) 20 Cal.4th 225, 241 [83 Cal.Rptr.2d 533, 973 P.2d 512].

defendant wished to injure and humiliate the victim before killing her in retaliation for those perceived injustices. There is no suggestion defendant's commission of this forced sex act against his own mother was merely incidental to her murder.

Finally, defendant contends the three special circumstance findings must be reversed because there was insufficient evidence of the underlying felonies themselves. As we explained, *ante*, sufficient evidence supports defendant's convictions for robbery, burglary and sodomy. Accordingly, we reject this claim as well.

### 3. *Alleged Inconsistent Verdicts*

Although defendant and Vieyra were charged with the same crimes and tried jointly, the jury convicted Vieyra of only second degree murder, while it convicted defendant of first degree murder with three special circumstances. Both defendant and Vieyra were convicted of robbery, two counts of burglary and grand theft auto, but Vieyra was acquitted of forcible sodomy. Vieyra was sentenced to a term of 15 years to life in prison, which was doubled under the Three Strikes law, creating a principal term of 30 years to life. He was also sentenced to various terms for his other felonies and enhancements, bringing his aggregate term to 52 years to life in prison. Defendant was sentenced to death. Defendant contends these verdicts are fatally inconsistent and thus violate the Eighth and Fourteenth Amendments to the United States Constitution, requiring we reduce his murder conviction to the second degree and vacate the penalty judgment.

The contention is meritless. The jury could reasonably have discerned a difference between defendant's and Vieyra's relative culpability. Defendant many times expressed his hatred of his mother, but Vieyra had no apparent dispute with her and in fact described his relationship with her as "very close." Although he accompanied defendant to the victim's home, Vieyra testified he was scared of defendant, suggesting some degree of duress. Vieyra expressed remorse, had volunteered to take a "blood or saliva" test to clear himself of the sodomy charge and told police about the attempt to sell the stolen goods to Leonard Mercado. The jury could thus have believed Vieyra's culpability was less than defendant's.

 Notwithstanding the foregoing, we agree with defendant that Vieyra's conviction for second degree murder is puzzling. Having convicted him of participating in the death of Loza and also of robbery and burglary, the jury should have returned a verdict of first degree murder by application of the felony-murder rule. But even assuming that the verdicts are inconsistent, defendant is not entitled to relief on that basis. " 'It is . . . settled that an

inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of a substantive offense, effect is given to both.' " (*People v. Panah* (2005) 35 Cal.4th 395, 490 [25 Cal.Rptr.3d 672, 107 P.3d 790]; see *People v. Avila* (2006) 38 Cal.4th 491, 600 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) The United States Supreme Court applies the same rule in the federal courts. (*United States v. Powell* (1984) 469 U.S. 57 [83 L.Ed.2d 461, 105 S.Ct. 471].)

■■■ Defendant argues it is "clear from the verdicts that the jury chose to disregard the law" and that it "exercise[d] some form of leniency towards Vieyra, and consequently did not follow the law." But, "[a]n inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*People v. Lewis, supra,* 25 Cal.4th at p. 656.)

Defendant cites no authority establishing that a state's tolerance of inconsistent verdicts violates a defendant's constitutional rights. Although he cites *People v. Klingenberg* (1996) 172 Ill.2d 270 [665 N.E.2d 1370, 1373–1376, 216 Ill.Dec. 813] for that proposition, the Illinois Supreme Court later overruled *Klingenberg* (*People v. Jones* (2003) 207 Ill.2d 122, 133 [797 N.E.2d 640, 647, 278 Ill.Dec. 45]) to "bring Illinois in line with the majority of states that have concluded that" inconsistent verdicts do not require relief. We conclude the verdicts, even if inconsistent, do not require that we reduce defendant's conviction for first degree murder to second degree murder or vacate the sentence of death. We also reject his argument that failure to do so will violate his constitutional rights.

### 4. *Alleged Instructional Errors*

#### a. *Failure to instruct on theft as a lesser included offense*

Defendant contends the trial court erred by failing to instruct the jury on theft as a lesser included offense of robbery. He also contends this error was one of constitutional dimension requiring reversal. We disagree and instead find no error.

■■■ A criminal defendant has a constitutional right to have his or her jury determine "every material issue presented by the evidence" and this includes the right, where appropriate, to have the jury instructed on lesser included offenses. (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].) "The state has no interest in a defendant obtaining an acquittal where he is innocent of the primary offense charged but guilty of a necessarily included offense. Nor has the state any legitimate

interest in obtaining a conviction of the offense charged where the jury entertains a reasonable doubt of guilt of the charged offense but returns a verdict of guilty of that offense solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense. Likewise, a defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt. Our courts are not gambling halls but forums for the discovery of truth." (*People v. St. Martin* (1970) 1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390].)

 Theft is a lesser included offense of robbery. (*People v. Ortega, supra,* 19 Cal.4th at p. 694.) Accordingly, the trial court would have been obligated to instruct on theft as a lesser included offense of robbery, even in the absence of a request (see *People v. Hughes* (2002) 27 Cal.4th 287, 365 [116 Cal.Rptr.2d 401, 39 P.3d 432] [sua sponte duty]), if the evidence had raised a question as to whether all of the elements of robbery were present and if there was evidence that would have justified a conviction of the lesser offense. (*People v. Ramkeesoon, supra,* 39 Cal.3d at p. 351.) Defendant advances two theories that he claims demonstrate he was guilty only of theft. First, he asserts the evidence showed he did not decide to steal the victim's property until after she was dead. (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887] ["when the intent to steal arose only after force was used, the offense is theft, not robbery"].) We disagree. The prosecution's theory of the case was that defendant had a dual motivation for the crimes: he hated his mother for having him raised by others, and he needed money. The second motivation is of course relevant to robbery. The prosecution thus presented evidence that defendant was only sporadically employed, often asked the victim for money, forcibly took money from her purse when she refused and unsuccessfully solicited Candina Bravo for money on the day of the crimes. The victim was also forcing defendant to move from her home. Although the jury could have simply rejected the prosecution's evidence showing defendant's motivation for killing the victim was money, "if there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions [on lesser included offenses] shall not be given." (*People v. Kraft* (2000) 23 Cal.4th 978, 1063 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Because there was no reason why the jury would have rejected the prosecution's evidence and defendant presented no evidence that he decided to steal only after the murder, there was no substantial evidence of after-acquired intent and thus no factual predicate for instructing the jury on theft as a lesser included offense.

Second, defendant claims that because he stole from a dead person and dead people do not experience fear or respond to force, he can be guilty only of theft and not robbery. (See *People v. Kelly* (1992) 1 Cal.4th 495, 529–530 [3 Cal.Rptr.2d 677, 822 P.2d 385] [defendants' testimony he found the victim's

rings in a garbage can and did not kill her was sufficient to require instruction on theft as a lesser included offense of robbery].) As we have explained, *ante*, the evidence showing defendant killed his mother was strong, and he presented no evidence that he just happened upon the victim after she was already dead. The fact, if it be one, that he did not take anything from the victim before he killed her does not make the crime less than a robbery so long as he harbored the intent to steal before he killed her. (*People v. Frye*, *supra*, 18 Cal.4th at p. 956; *People v. Jackson*, *supra*, 128 Cal.App.4th at p. 1330.) Although defendant claims the failure to instruct on theft left the jury with an all-or-nothing choice, such a choice did not violate his rights because, on the state of the evidence presented, the crime was either robbery or nothing.

Accordingly, the trial court did not err in failing to instruct on theft as a lesser included offense.

### b. *Failure to instruct on involuntary manslaughter as a lesser included offense*

Defendant's jury was instructed on first degree murder, second degree murder and voluntary manslaughter. Defense counsel raised the issue of whether defendant was intoxicated to the point of unconsciousness such that he would be entitled to an instruction on involuntary manslaughter. Counsel conceded there was no such evidence but argued the standard involuntary manslaughter instruction should be modified to permit defendant's intoxication to negate intent to kill. The trial court said it would consider a proposed modification if counsel would present one to the court, but counsel apparently let the matter drop, for the proposed instruction was not mentioned again.

Defendant now argues the trial court erred by failing to instruct the jury on involuntary manslaughter. Involuntary manslaughter is ordinarily a lesser offense of murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442].) "One commits involuntary manslaughter either by committing 'an unlawful act, not amounting to felony' or by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue." (*People v. Cook* (2006) 39 Cal.4th 566, 596 [47 Cal.Rptr.3d 22].)

 Counsel here conceded there was insufficient evidence to warrant an instruction on involuntary manslaughter.[9] We agree. "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter. 'Unconsciousness is ordinarily a complete defense to a charge of criminal homicide. (Pen. Code, § 26, subd. [Four].) If the state of unconsciousness results from intoxication voluntarily induced, however, it is not a complete defense. (Pen. Code, § 22.) . . . [I]f the intoxication is voluntarily induced, it can never excuse homicide. [Citation.] Thus, the requisite element of criminal negligence is deemed to exist irrespective of unconsciousness, and a defendant stands guilty of involuntary manslaughter if he voluntarily procured his own intoxication.' " (*People v. Ochoa, supra,* 19 Cal.4th at p. 423.) Such a person need not be incapable of movement. (*People v. Hughes, supra,* 27 Cal.4th at p. 343.)

The evidence here shows defendant had consumed some unknown amount of alcohol, but there was no evidence he was so intoxicated that he could be considered unconscious. He went to the victim's home, spoke to his brother Chachi, killed Loza, and then ransacked her and Carlon's bedrooms, loading Loza's car with stolen items before driving away. Later, he tried to sell the stolen goods to Leonard Mercado. Nothing in these facts even hints that defendant was so grossly intoxicated as to have been considered unconscious.

Even assuming the court erred, the failure to instruct on involuntary manslaughter was harmless. The jury was properly instructed on first degree murder, second degree murder and voluntary manslaughter. As in *People v. Rogers, supra,* 39 Cal.4th at page 884: "The jury rejected the lesser options and found defendant guilty of first degree premeditated murder. Under the circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option." Moreover, the jury having convicted defendant of robbery, sodomy and burglary and having sustained the associated special circumstances, defendant was necessarily guilty of first degree felony murder if he had any responsibility at all for the killing. Accordingly, we find the trial court did not err in failing to instruct on involuntary manslaughter.

### c. *Failure to instruct on third party culpability*

Defendant's jury was properly instructed on the presumption of innocence, the People's burden of proof and the concept of reasonable doubt. Specifically, the jury was instructed that if it had a reasonable doubt as to

---

[9] To the extent defendant wished the court to modify an existing instruction itself correct in law, it was his burden to propose it. (*People v. Lawley, supra,* 27 Cal.4th at p. 161.)

defendant's guilt, he must be found not guilty. Defendant contends that inasmuch as his defense was that Vieyra sodomized and killed his mother, the trial court violated his federal constitutional rights to a jury trial and to due process by failing to instruct the jury that he need not prove his innocence or that Vieyra was guilty, but must merely raise a reasonable doubt as to his own guilt. As defendant concedes he did not request such an instruction, he necessarily claims the trial court had a sua sponte duty to instruct the jury how the burden of proof applies to evidence of third party culpability. We disagree.

██ The applicable principles are clear. A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it. (*People v. Robinson* (2005) 37 Cal.4th 592, 625 [36 Cal.Rptr.3d 760, 124 P.3d 363].) ██ A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." (*People v. Holt, supra,* 15 Cal.4th at p. 688.) ██ Finally, a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions "as to defenses ' "that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case." ' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669 [21 Cal.Rptr.3d 612, 101 P.3d 509].)

The jury was instructed that defendant was presumed innocent and that to convict him, the jury must find him guilty beyond a reasonable doubt. Had the jury entertained a reasonable doubt that defendant sodomized and killed the victim and instead believed Vieyra committed those crimes, presumably it would have acquitted defendant. (Assuming, of course, that it also found he did not aid or abet those crimes.) Thus, no special instruction on third party culpability was necessary to apprise the jury of the pertinent legal principles and, contrary to defendant's argument, the instructions given do not suggest he had the burden to prove Vieyra was guilty before he could reap the benefit of the jury's doubt about his own guilt. Neither *Mathews v. United States* (1988) 485 U.S. 58 [99 L.Ed.2d 54, 108 S.Ct. 883] nor *People v. Adrian* (1982) 135 Cal.App.3d 335 [185 Cal.Rptr. 506], on which defendant relies, requires a different result. In both cases, the defendant *requested* an instruction that the trial court *refused.* (*Mathews,* at p. 62; *Adrian,* at p. 337.) Neither is authority for the proposition that the trial court here had a sua sponte duty to instruct on third party culpability.

Finally, even assuming for purposes of argument the trial court erred by failing to modify the instructions, no prejudice resulted. As noted, the jury

was instructed on reasonable doubt and could have acquitted defendant had it concluded Vieyra was the killer. Moreover, the evidence—including defendant's expressions of anger and hatred towards his mother, his present need of money, Chachi's testimony defendant was arguing with the victim in her bedroom, Vieyra's testimony and lack of a motive—was overwhelming that defendant, not Vieyra, sodomized and killed Loza. Any instructional error in this regard was thus harmless.

> d. *Failure to instruct jury to view Vieyra's testimony with distrust*

The trial court instructed the jury on the definition of an accomplice (CALJIC No. 3.10), the requirement that the testimony of accomplices be corroborated (CALJIC No. 3.11) and the sufficiency of evidence needed to supply corroboration (CALJIC No. 3.12). Defendant did not request, and the trial court did not give, CALJIC No. 3.18, which at the time directed the jury to view an accomplice's testimony with "distrust." Although neither party mentions it in their briefs in this court, the question whether to give CALJIC No. 3.18 was raised and discussed in the trial court. The prosecutor objected to giving the instruction, citing a use note that appeared in the published version of the then current version of CALJIC. Counsel for Vieyra joined in the objection, and the trial court agreed. Counsel for defendant remained silent during this discussion.

Despite this discussion in the trial court and despite his attorney's silence, defendant contends the trial court's failure to instruct the jury with CALJIC No. 3.18 was both state law error and error of federal constitutional dimension requiring reversal. We disagree and instead find no error. At the time of defendant's trial, CALJIC No. 3.18 (5th ed. 1988) provided: "The testimony of an accomplice *ought to be viewed with distrust.* This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case." (Italics added.) At the time of defendant's trial,[10] the law provided that CALJIC No. 3.18 should not

---

[10] We have since required that the standard instruction be modified. "[T]he jury should be instructed to the following effect whenever an accomplice, or a witness who might be determined by the jury to be an accomplice, testifies: '*To the extent an accomplice gives testimony that tends to incriminate the defendant*, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case.' " (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928], italics added.) CALJIC No. 3.18 (2007) now provides that "[t]o the extent that [an accomplice] [or] [*a codefendant*] gives testimony that tends to incriminate [the] [a] [another] defendant, it should be viewed with caution." (Italics added; see also Judicial Council of Cal. Crim. Jury Instns. (2006–2007) CALCRIM No. 334.)

be given sua sponte if the alleged accomplice was called as a witness by the defendant (*People v. Williams* (1988) 45 Cal.3d 1268, 1314 [248 Cal.Rptr. 834, 756 P.2d 221]), the view being that for the instructions to impugn the integrity of a defense witness was highly prejudicial (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 655, p. 943). In this case, neither defendant nor the prosecution called Vieyra to the stand; Vieyra, a codefendant, testified in his own behalf. At the time of trial, there was no law indicating that a court must provide CALJIC No. 3.18 sua sponte when a codefendant introduces accomplice testimony, and defendant did not request such an instruction. Accordingly, the trial court correctly granted the request that CALJIC No. 3.18 not be given to the jury. Nor was the trial court under a sua sponte duty to modify the instruction for defendant's benefit. (*People v. Guiuan, supra*, 18 Cal.4th at p. 560.)

### e. *CALJIC No. 6.40 (accessory after the fact)*

Defendant next argues the trial court's decision to instruct and then reinstruct the jury on the concept of accessory after the fact so confused the jury that the instruction violated his federal constitutional rights to due process of law, a fair trial and effective assistance of counsel. (U.S. Const., 5th, 6th & 14th Amends.) We disagree, for there is no possible way the instruction negatively affected defendant.

Before instructing the jury, the trial court raised the question of instructing on accessory after the fact, saying: "I took a look at the accessory after the fact instruction. It is not a lesser, certainly not a lesser included [offense], and so then I went back and looked at the accessory instructions . . . and I don't think the record will bear those instructions, because what the accessory after the fact instruction indicates is a situation where there has been conduct following a known felony, conduct which was engaged in with the specific intent to assist the perpetrator in evading or avoiding arrest or some other consequences.

"Mr. Vieyra's testimony was that he only did what he did because he was frightened of Mr. Abilez and did not give any indication that in doing what he did that he was intending to help him evade, avoid or whatever.

"That is my sense of the record at this point.

"Now, I am not foreclosing any discussions. I want to tell you what my thinking was when I looked at that instruction.

"So what I am going to do is recess the proceedings, I am going to hand down the set of instructions, give counsel an opportunity to work together on those instructions."

When the court asked defendant's counsel whether he had any comment, Bestard replied: "No."

The trial court apparently changed its mind, for it gave the jury an instruction patterned on CALJIC No. 6.40 (5th ed. 1988), which apprised the jury of the requirements for finding a defendant guilty of being an accessory after the fact,[11] although the instruction omitted the first sentence from the standard instruction: "Defendant is accused [in Count[s] _____] of having committed the crime of being an accessory to a felony in violation of section 32 of the Penal Code."

During deliberations, the court decided the inclusion of robbery and burglary in CALJIC No. 6.40 was incorrect, as a person assisting in those crimes after the fact would still be guilty of the target crime and not the lesser crime of being an accessory. The court proposed to recall the jury and reread CALJIC No. 6.40 without the references to robbery and burglary, i.e., specifying murder and sodomy only. Counsel for defendant and for Vieyra both expressly declined to object, although the prosecutor objected. The court then reinstructed the jury.

Verdict forms for the crime of being an accessory were provided the jury for codefendant Vieyra but not for defendant. The jury did not convict Vieyra of being an accessory.

Defendant contends the trial court's initial position, i.e., that no evidence supported giving CALJIC No. 6.40, was correct because no evidence existed to show either defendant or Vieyra aided a principal to a murder or sodomy "after" it had been committed. We disagree. It was undisputed that defendant and Vieyra were both in Loza's home at the time of the crimes. Vieyra testified that he saw defendant sitting on top of the prone victim with a white sock around her neck, and that he later emerged from the bedroom and said "estuvo" ("it is done"). Vieyra further testified that he did not sodomize the victim, a claim supported by the blood test for which he volunteered. Vieyra admitted that after the crimes, he left the victim's house with defendant in her car. These actions could have been viewed by the jury as assisting the principal to "avoid or escape from arrest, trial, conviction or punishment" for the crimes of murder or sodomy. (§ 32.) There was thus sufficient evidence to support the accessory instruction.

---

[11] Thus, defendant's jury was instructed: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in that felony, with the specific intent that the principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that the principal has committed that felony or has been charged with that felony, is guilty of the crime of accessory to a felony, in violation of Penal Code section 32.

"In order to prove this crime, each of the following elements must be proved:

"One, a felony, namely, burglary, robbery, sodomy and/or murder was committed;

"Two, defendant harbored, concealed or aided a principal in that felony with the specific intent that the principal avoid or escape arrest, trial, conviction or punishment;

"And three, defendant did so with knowledge that the principal committed the felony."

No support exists for defendant's further assertion that the provision of accessory-after-the-fact verdict forms for Vieyra and not defendant would have led the jury to understand the trial court credited Vieyra's testimony or that defendant was the more culpable of the two defendants. Unlike Vieyra, defendant did not testify at the guilt phase and there was thus no evidence he was a mere accessory to the crimes. Moreover, contrary to defendant's unsupported assertion, the jury did not express any confusion related to the accessory instruction, and that the instruction "confuse[d] [the] defense strategy" or "diminish[ed] the impact of more critical instructions" is pure speculation. We thus conclude the trial court did not err in instructing the jury on accessory after the fact, or by failing to provide the jury with verdict forms for that crime with defendant's name.[12]

### f. *CALJIC No. 2.52 (flight)*

Defendant contends that, for several reasons, the trial court erred by instructing the jury with CALJIC No. 2.52, which addresses the issue of flight as evidence of a consciousness of guilt. As we explain, we find no error.

Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. [¶] The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." In accordance with this section, defendant's jury was instructed with CALJIC No. 2.52, which is substantially identical to the statutory language. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1182 [32 Cal.Rptr.3d 759, 117 P.3d 476] [CALJIC No. 2.52 is "derived" from § 1127c].)

 We have construed section 1127c "as mandating a rule that if there is evidence identifying the person who fled as the defendant, and if such evidence is relied on as tending to show guilt, then a flight instruction is

---

[12] To the extent defendant contends he was denied due process of law under the Fifth and Fourteenth Amendments to the United States Constitution because the prosecution failed to give notice it was relying on the theory he was an accessory after the fact, we conclude he forfeited the claim by failing to object at trial. (*People v. Cole* (2004) 33 Cal.4th 1158, 1205 [17 Cal.Rptr.3d 532, 95 P.3d 811].) To the extent defendant contends his defense counsel was constitutionally ineffective under the Sixth Amendment for failing to object to the instruction, we reject the contention, as counsel could reasonably have anticipated the instruction had no effect on his client's case.

proper." (*People v. Roberts* (1992) 2 Cal.4th 271, 310 [6 Cal.Rptr.2d 276, 826 P.2d 274].) "A flight instruction is proper whenever evidence of the circumstances of [a] defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge." (*People v. Turner, supra*, 50 Cal.3d at p. 694.)

Defendant first contends giving the instruction was error because there were "no facts" suggesting his decision to leave the victim's home was motivated by a desire to avoid detection or apprehension for the murder. We disagree. " 'An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " (*People v. Visciotti, supra*, 2 Cal.4th at p. 60; see *People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Here, the victim was killed in her house in La Puente in Los Angeles County. Evidence was presented that immediately after the victim was killed, defendant and Vieyra loaded electronic equipment from her bedroom and from Carlon's bedroom into the victim's car and then drove away from the house in the victim's car. They were apprehended several hours later and several miles away, in Colton in San Bernardino County, still in possession of the victim's car. From these facts, the jury could reasonably infer that defendant's decision not to stay in the house, but instead to leave, manifested a consciousness of guilt. (See *People v. Carter, supra*, 36 Cal.4th at p. 1182 [flight instruction proper where defendant left California for Las Vegas a few days after the crimes]; *People v. Smithey* (1999) 20 Cal.4th 936, 982 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [flight instruction proper where "defendant drove to another town instead of summoning help"]; *Bradford*, at p. 1055 [flight instruction proper where defendant left the apartment where he killed the victim, went to another apartment, packed his belongings and asked for a ride out of town].)

Defendant next contends the trial court erred and also violated his rights to a trial by jury and to due process under the Sixth and Fourteenth Amendments to the United States Constitution by instructing on flight without requiring the jury to make a finding as to the preliminary facts underlying the instruction, namely that: (1) a person fled the scene of the crime; (2) defendant was that person; and (3) he fled to avoid arrest. But "the instruction did not assume that flight was established, leaving that factual determination and its significance to the jury." (*People v. Visciotti, supra*, 2 Cal.4th at p. 61.) Instead, "the instruction merely permitted the jury to consider evidence of flight in deciding defendant's guilt or innocence; it did not suggest that the jury should consider such evidence as dispositive." (*People v. Carter, supra*, 36 Cal.4th at p. 1182.) We thus reject defendant's contention some preliminary finding of fact was required before the court could instruct the jury on flight.

■ Third, defendant claims the trial court erred in instructing the jury with CALJIC No. 2.52 because there was no evidence that, at the time he left the victim's home, he was aware of the criminal charges against him. The claim is baseless, as his awareness of the charges is not required as a prerequisite for the instruction. (*People v. Carter, supra,* 36 Cal.4th at p. 1182.)

Fourth, defendant contends the flight instruction should have been modified sua sponte to inform the jury that the consciousness of guilt it could infer from his flight could not be used to prove the degree of the murder. He is incorrect. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127–128 [2 Cal.Rptr.2d 335, 820 P.2d 559].) In any event, any error would be harmless under any standard; because the jury convicted defendant of several qualifying felonies, under the felony-murder rule the only degree it could find was murder in the first degree.

### 5. *Cumulative Effect of Guilt Phase Errors*

Defendant contends the cumulative effect of all the errors at the guilt phase of his trial requires reversal. Although "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error" (*People v. Hill, supra,* 17 Cal.4th at p. 844), we have found no error occurring at the guilt phase. Accordingly, we find no cumulative error.

### II. PENALTY PHASE

### A. *Facts*

### 1. *Aggravating Evidence*

The People's case in aggravation, in addition to the circumstances of the crime itself (see § 190.3, factor (a)), consisted of evidence of defendant's prior felony convictions (*id.,* factor (c)) and victim impact evidence (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]; *People v. Roldan, supra,* 35 Cal.4th at p. 731). Thus, the trial court instructed the jury defendant had suffered prior felony convictions in 1978 for two separate residential burglaries, in 1981 for assault with a deadly weapon, in 1987 for possession of heroin, in 1990 for sale or transportation of a controlled substance and in 1995 for possession of a firearm by a felon. Carlon took the stand again and described the impact defendant's crimes had had on her family. Although her brother Johnny Garcia had previously come by the house every day, she had had no contact with him since the murder. In

addition, in Loza's absence, Carlon now had primary responsibility in caring for Chachi, who was disabled. She was required to bathe him, feed him, take him to his doctor appointments and wash his clothes. She testified she missed her mother, who had been her best friend.

When the woman who raised defendant died, Loza paid $7,000 for her funeral. Loza took defendant in when he was released from prison, but they often fought. When Carlon told defendant not to speak disrespectfully to her mother, defendant told her: "What are you going to do about it?"

Robert Loza, the victim's son and defendant's half brother, testified that the murder had a negative effect on his family's unity. He reported that the family had suffered "emotionally" and that they did not have family gatherings, such as barbeques, anymore. As a result of the murder, Robert, who was the legal owner of the house, had to clean, paint and rearrange the house because none of the other family members wanted to be reminded of their mother's murder.

### 2. *Mitigating Evidence*

Defendant's case in mitigation consisted largely of his own testimony. Defendant testified he was raised by Marcelino and Petra Abilez in Chino; his grandmother also lived with them. He remembered being in the Cub Scouts and playing football in elementary school. He first met the victim, Loza, when he was six; she was introduced to him as his "other mother." He was happy to have had two mothers, and Loza came to see him about twice a year. When he was eight years old, he learned Loza was his biological mother, but that she had given him to Marcelino and Petra to raise because they could not have children.

Marcelino died in an accident when defendant was nine years old. In middle school at age 13, defendant fell in with a "bad crowd." When he was 14, he and Petra moved with his grandmother to a different home. He began high school but dropped out after the ninth grade, having achieved a C-minus grade average. His grandmother died that same year, and Petra, who was diabetic, died in 1990. Defendant was incarcerated at the time and was unable to attend Petra's funeral.

Defendant admitted being in and out of prison during his life and attributed it to being a "victim of environment," meaning "drug dealing, gangs, stuff like that." He had become addicted to drugs when he was 17 years old and sold drugs because it "seemed easy." He had trouble finding a job after being in prison so he resumed selling drugs. He admitted being intoxicated much of the time on alcohol, heroin and methamphetamine because he was "discouraged and depressed." Defendant admitted he had fathered two children, but did not know where they were.

After defendant was released from prison this last time, Loza took him in. He got along well with her and appreciated what she had done for him. In addition, when he was in prison, she would send him anything he wanted. He initially had no anger towards her at all and denied telling anyone he was angry at her for giving him up to be raised by Marcelino and Petra. Then, after living with Loza for about a month, he said she changed and no longer treated him well. She insisted he pay her back for the money she had spent on Petra's funeral and for the packages and money she had sent to him in prison. Their relationship thereafter was strained. For example, she would not allow him to answer the telephone because he did not pay the bill. Once, she threw a cup of beans in his face. Another time, she woke him up at 6:00 a.m. and told him to look for a job. When he fell back asleep, she poured an unfinished bottle of beer in his face.

Defendant testified he did not remember much about the events of March 15, 1996. He woke late, missing a chance to work on a landscaping job, and then met a friend named Connie and drank "a couple six-packs" with her. He took some heroin in the morning and again in the afternoon. He denied going to Candina Bravo's house that day, but remembered meeting Vieyra and sitting on a wall, drinking beer. They each drank a quart of beer and then shared another quart. When they went to Loza's home, she became upset because Vieyra had stolen a bedspread from the house and she insisted Vieyra leave. Defendant and Vieyra eventually left and bought more beer at a local store. Walking home, they bought and consumed more beer and then sat in Loza's front yard talking. Defendant remembered going in the house to talk to Loza, but did not remember yelling at or striking her. He did not remember telling Chachi to return to his room or breaking into Carlon's bedroom. He denied taking anything from Loza's bedroom but may have taken things from Carlon's bedroom. He did not steal Loza's car; he claimed she gave him the keys and allowed him to use the car to move Vieyra's belongings from the house.

Regarding the murder, defendant testified he "wasn't a hundred percent involved in [it]," that he did not think he did it and that he was not capable of doing it. He denied sodomizing his mother. He said he did not deserve to die and described himself as a "shy, loving person." On cross-examination, he stated that Candina Bravo, Gabriel Arce and codefendant Vieyra had all lied in their testimony.

B. *Issues*

1. *Application of* Chapman

We held in *People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135], that state law error occurring at the penalty phase must

be assessed on appeal by asking whether it is reasonably possible the error affected the verdict. Defendant contends that, because a life is at stake, we should instead apply the standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], that is, that reversal is required unless it is shown the error was harmless beyond a reasonable doubt. We have held, however, that the two standards are the same "in substance and effect." (*People v. Jones, supra*, 29 Cal.4th at p. 1264, fn. 11; *People v. Ochoa, supra*, 19 Cal.4th at p. 479.)

### 2. *Alleged Prosecutorial Misconduct: Invoking the Bible*

Defendant contends the prosecutor committed misconduct in closing argument by arguing biblical support for a sentence of death. Thus, during closing argument, the prosecutor argued the aggravating evidence was overwhelming and substantial in comparison to the mitigating evidence and then said: "And do not, ladies and gentlemen—don't—sometimes at the end of a trial [someone] will say only God could take a life. God didn't take Beatrice Loza's life. He didn't sanction that. God had nothing to do with it. When someone says at the end of this trial, oh, only God can do it, sometimes at the end of the trial, you will hear some kind of talk like, well, if you send him to prison he will die in prison anyway. Oh, okay. [¶] Gee, Beatrice Loza died in that bedroom, a very painful, humiliating, disgusting death, and the law provides if aggravating circumstances substantially outweigh the mitigating, this is the appropriate penalty." There was no immediate objection.

During surrebuttal, defense counsel referred to the story of Cain and Abel (though not by name) and in telling the story, said: "Well, where is your brother? [¶] And the—the other brother said to him, well, I am not my brother's keeper. Why are you asking me?" Counsel thereafter argued the person in the story who killed his brother was not sentenced to death but was instead banished from the land for the balance of his life. After argument had concluded, defense counsel, in chambers, objected to the prosecutor's biblical reference. As if anticipating the argument that he, too, had invoked the Bible in his argument, counsel argued: "There was no invocation of God [in] my closing arguments or rebuttal of that, and I believe [the prosecutor's argument] was inappropriate."

The trial court overruled the belated objection, explaining that the prosecutor's argument "was not an invocation in any way in my judgment, based upon these comments, to have biblical justification for doing—for doing what was done. [¶] In fact, I thought it is somewhat to the contrary, saying, look, this is a secular proceeding and it is a secular decision that we have to make."

At the threshold, we find defendant forfeited this issue by failing to make a timely objection. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1209 [120

Cal.Rptr.2d 477, 47 P.3d 262] [failure to object to biblical reference forfeits the claim for appeal]; *People v. Barnett, supra,* 17 Cal.4th at p. 1122 [objection to evidence must be timely].) Had he objected when the prosecutor first made reference to God, the trial court could have intervened and cured any possible prejudice. Nor is the failure to timely object excused by any alleged deficient performance by defense counsel, for there is no suggestion in the record that counsel lacked a tactical reason for his failure to object. (*People v. Gray, supra,* 37 Cal.4th at p. 207.) Indeed, the record suggests defense counsel wished to make an oblique reference to the biblical story of Cain and Abel in an attempt to convince the jury to spare defendant's life.[13]

Were we to find defendant had preserved the claim, we would find no error. Although any reference to biblical authority is fraught with danger (*People v. Roldan, supra,* 35 Cal.4th at p. 743), we agree with the trial court that, in the circumstances of this case, the prosecutor's comments did not improperly ask the jury to apply biblical authority in lieu of California law or otherwise appeal to a higher authority. Finally, even if the prosecutor's comments were improper, the misconduct was harmless under any standard; the comments in question were brief and the argument undeveloped. (*People v. Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].)

### 3. *Failure to Instruct on the Meaning of Life Without Possibility of Parole*

The trial court instructed the jury that: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstances alleged in this case have been specially found to be true. [¶] Under the law of this state, you must now determine which of these penalties shall be imposed on the defendant." This introduction to the standard penalty phase instruction, CALJIC No. 8.84, was given without objection or request for modification. Citing social science studies that he claims suggest that almost 25 percent of capital case jurors believe that a sentence of life without parole will result in an ultimate sentence of 10 years or less, and that over 75 percent believe that such a prisoner will be paroled sometime within his lifetime, defendant contends the standard instruction failed to define adequately the meaning of life imprisonment without possibility of parole and the trial court erred by failing sua sponte to correct it. We have, however, already found CALJIC No. 8.84 adequately informs the jury of the meaning of a life sentence. (*People v. Smithey, supra,* 20 Cal.4th at pp. 1008–1009.) Although petitioner argues we

---

[13] We are unconvinced by counsel's assertion that he did not also invoke the Bible. (See Genesis 4:9 ["Then the Lord said to Cain, 'Where is your brother Abel?' [¶] 'I don't know,' he replied. 'Am I my brother's keeper?' "].)

should revisit the issue in light of the high court's decision in *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], we have already explained in prior cases that *Shafer* is distinguishable and does not cast doubt on our previous cases addressing the issue. (*People v. Prieto* (2003) 30 Cal.4th 226, 269–271 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; see *People v. Turner* (2004) 34 Cal.4th 406, 438 [20 Cal.Rptr.3d 182, 99 P.3d 505] [defendant conceded CALJIC No. 8.84 adequately conveyed parole ineligibility].) As defendant presents no reason to question those decisions, we reject his claim.

To the extent defendant contends that *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] alters the analysis, he is wrong. As we explained in a somewhat different setting: " '*Ring* imposes no new constitutional requirements on California's penalty phase proceedings.' " (*People v. Stanley, supra*, 39 Cal.4th at p. 964.)

### 4. *Double Counting Felonies*

Defendant contends that double counting the charged felonies—once to elevate the degree of the homicide to first degree murder and again to render him eligible for the death penalty (§ 190.2, subd. (a)(17))—is improper. He concedes we rejected this precise argument in *People v. Marshall* (1990) 50 Cal.3d 907, 945–946 [269 Cal.Rptr. 269, 790 P.2d 676], but asserts we should reconsider that case in light of the number of special circumstance allegations now included in the law, rendering "the narrowing function of the special circumstances . . . a nullity." We conclude no grounds exist to revisit our decision in *Marshall*. (See *People v. Catlin* (2001) 26 Cal.4th 81, 158 [109 Cal.Rptr.2d 31, 26 P.3d 357] ["first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment"]; see also *People v. Millwee* (1998) 18 Cal.4th 96, 164 [74 Cal.Rptr.2d 418, 954 P.2d 990] [double-counting argument "has been rejected many times before given the manner in which our death penalty scheme permissibly narrows the class of death-eligible offenders and guides the sentencer's discretion"]; *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246 [98 L.Ed.2d 568, 108 S.Ct. 546] ["that the aggravating circumstance duplicated one of the elements of the crime does not make [a death] sentence constitutionally infirm"].)

### 5. *Defendant's Motion for Modification*

Following the penalty verdict, the trial court entertained and denied the automatic motion for modification of the verdict pursuant to section 190.4, subdivision (e). Defendant contends generally that the trial court erred in denying the motion because the court failed to independently reweigh the

evidence. More particularly, he argues the court failed to accord proper weight to his mitigating evidence, which showed he had been abused by his mother, he suffered from "chronic drug abuse precipitated by his tumultuous upbringing, and his intoxication at the time of [the] offense." In addition, he contends the court's error rendered the death sentence arbitrary and capricious in violation of the Eighth Amendment to the United States Constitution, as well as state constitutional guarantees. As we explain, we disagree.

Section 190.4, subdivision (e) provides: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, *and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.*" (Italics added.)

The record in this case demonstrates the trial court was well aware of its "authority and obligation to independently assess and evaluate the evidence." (*People v. Moon, supra,* 37 Cal.4th at p. 46.) It first explained that its "role in this matter is to reweigh the evidence of aggravating and mitigating factors and to determine whether in the court's independent judgment the weight of the evidence supports the jury's verdict." It then concluded that "[t]he jury's assessment of the evidence that the factors in aggravation substantially outweigh the factors in mitigation and that death is warranted is, in the court's view, overwhelmingly supported by the evidence." Further explaining its conclusion, the court noted that it "has searched the record for factors in mitigation and I have to say that I am not sure I can begin to understand the arguments in mitigation on [defendant's] behalf." It found "very little evidence [was] offered in this case suggesting that there are any factors in mitigation, but such evidence as was presented, the court has considered and the court believes that the jury was correct."

When defense counsel emphasized the evidence of defendant's intoxication at the time of the crime was mitigating, the court responded: "The court does not believe that there was . . . evidence that on many occasions he drank and drank heavily and may have been [intoxicated on the day of the crimes]— there was some evidence which was tendered to suggest that he had been drinking on this day, but if I take that evidence—not all of that evidence was credible to the extent that people talked about his drinking on that day. There was not a suggestion in my mind that the drinking rose to the level where he

would have been intoxicated." Finally, the court opined: "[E]ven if I were to take [defendant's alleged intoxication] into account and consider that as accurate within the meaning of [section] 190.3, I don't think it would change the calculus as to whether or not the aggravating circumstances outweigh the mitigating factors in this case."

As is apparent, the trial court applied the correct standard and properly conducted an independent reweighing of the aggravating and mitigating evidence. That it did not find defendant's proffered mitigating evidence as persuasive as he would have liked does not undermine this conclusion. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1267–1268 [120 Cal.Rptr.2d 432, 47 P.3d 225].) We conclude the trial court properly performed its duty under section 190.4, subdivision (e).

### 6. *CALJIC No. 8.88*

The trial court instructed the jury with CALJIC No. 8.88, the standard instruction describing the jury's duties at the penalty phase. Defendant now contends this instruction was defective in numerous ways, thereby violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as corresponding rights under the state Constitution. He concedes we previously have rejected all of these arguments but contends those cases were incorrectly decided and should be reconsidered. Having found no reason to reconsider our prior holdings, we reject these claims and list them here to ensure a future court will consider them fully exhausted:

—The instruction is not vague and imprecise (*People v. Perry* (2006) 38 Cal.4th 302, 320 [42 Cal.Rptr.3d 30, 132 P.3d 235] [CALJIC No. 8.88 is not vague]);

—The instruction did not deprive defendant of the " 'individualized consideration' " required by the Eighth Amendment (*People v. Cornwell, supra,* 37 Cal.4th at p. 103);

—The instruction's use of the phrase " 'so substantial' " in connection with the mitigating circumstances did not suggest the jury was powerless to return a life sentence even if it found the mitigating factors outweighed the aggravating ones (*People v. Boyette, supra,* 29 Cal.4th at p. 465);

—The instruction does not imply that a single mitigating factor was insufficient to outweigh all the aggravating factors and justify a life sentence (*People v. Young* (2005) 34 Cal.4th 1149, 1227 [24 Cal.Rptr.3d 112, 105 P.3d 487]);

—The instruction did not mislead the jurors by using the phrase "life without parole" instead of "life without *the possibility* of parole" (see *People v. Boyer* (2006) 38 Cal.4th 412, 487 [42 Cal.Rptr.3d 677, 133 P.3d 581] ["We are not persuaded [by research] suggesting many jurors do not understand that life without parole actually means no possibility of parole"]);

—The instruction did not " 'improperly reduce the prosecution's burden of proof' " at the penalty phase because the prosecution does not bear the burden of proof at the penalty phase (*People v. Cornwell, supra,* 37 Cal.4th at pp. 103–104);

—The instruction's use of the word "totality" did not improperly suggest a single mitigating factor could not outweigh all aggravating factors (*People v. Dickey* (2005) 35 Cal.4th 884, 929 [28 Cal.Rptr.3d 647, 111 P.3d 921]);

—The instruction is not improperly "death-oriented" in that "it tells the jury what warrants death but fails to inform the jury what warrants life" (see *People v. Stanley, supra,* 39 Cal.4th at p. 963);

—The instruction adequately defines the meaning of a mitigating circumstance, and the jury would not have understood that phrase to refer to only "the crime in question" (see *People v. Welch* (1999) 20 Cal.4th 701, 772–773 [85 Cal.Rptr.2d 203, 976 P.2d 754]).

### 7. *Failure to Instruct on Lingering Doubt*

Defendant next argues we must reverse the penalty judgment because the trial court failed to instruct the jury it could consider as a mitigating factor any lingering doubt it had about his guilt of the charged crimes. He acknowledges we have rejected this argument many times in other cases (see *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1067 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Gray, supra,* 37 Cal.4th at p. 231), but argues the reasonable doubt instruction (CALJIC No. 2.90), with its use of the phrase "moral certainty," "exacerbated" the error. But defendant's jury was not instructed with the phrase "moral certainty." In any event, the jury could have considered any lingering doubt it had under section 190.3, factor (k), with which it was instructed. That factor permits the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." "The jury need not be specifically instructed that lingering doubt is a factor to consider, as that concept is encompassed in factor (k)." (*People v. Avila, supra,* 38 Cal.4th at p. 615.) We find no error.

### 8. *Failure to Instruct on the "Presumption of Life"*

Defendant next contends the trial court erred by failing to instruct the jury that, when deciding the appropriate penalty, it should presume the appropriate sentence is life in prison. We disagree, because it is not constitutionally required to instruct a capital jury on a so-called "presumption of life." (See *People v. Maury* (2003) 30 Cal.4th 342, 440 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Defendant submits the failure to so instruct the jury violated his constitutional rights to due process of law, equal protection, a reliable penalty determination and to be free of cruel and unusual punishment under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, but provides no argument or citation to authority supporting this assertion, other than to say that our precedents are "wrongly decided" and should be reconsidered.

We disagree. As we explained in *People v. Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980]: "If a death penalty law properly limits death eligibility by requiring the finding of at least one aggravating circumstance beyond murder itself, the state may otherwise structure the penalty determination as it sees fit, so long as it satisfies the requirement of individualized sentencing by allowing the jury to consider all relevant mitigating evidence." (*Id.* at p. 190, citing *Tuilaepa v. California* (1994) 512 U.S. 967, 972 [129 L.Ed.2d 750, 114 S.Ct. 2630], *Boyde v. California* (1990) 494 U.S. 370, 377 [108 L.Ed.2d 316, 110 S.Ct. 1190], and *Zant v. Stephens* (1983) 462 U.S. 862, 875 [77 L.Ed.2d 235, 103 S.Ct. 2733].)

### 9. *Failure to Instruct on Pity as a Mitigating Circumstance*

The jury was instructed at the guilt phase in accordance with CALJIC No. 1.00 that: "You must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." For the penalty phase, the jury was instructed to "[d]isregard all other instructions given to you in other phases of this trial, except for those [given the jury for the penalty phase]." Although it was not instructed specifically that it could consider pity for defendant as a mitigating factor, it was instructed in accordance with section 190.3, factor (k): "[The jury should consider] any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." (CALJIC No. 8.85, factor (k).)

Despite these instructions, defendant contends the trial court violated his rights under the Eighth Amendment to the United States Constitution by failing to instruct the jury specifically that it could consider pity for him as a mitigating factor. Because the trial court instructed the jury with an expanded section 190.3, factor (k) instruction, it did not err in failing to instruct more specifically on pity as a mitigating factor. (*People v. Smith, supra,* 30 Cal.4th at p. 638, and cases cited.)

10. *Constitutional Challenges to the California Death Penalty Law*

Defendant contends that "[m]any features of this state's capital sentencing scheme, alone or in combination with each other, violate the United States Constitution." He concedes we have rejected these claims in previous decisions but argues we should reconsider them. Having found no reason to do so, we reject these claims and list them here to ensure a future court will consider them fully exhausted. Accordingly, we conclude the death penalty law is not unconstitutional:

—For failing to "genuinely narrow the class of persons eligible for the death penalty" generally (see *People v. Boyette, supra,* 29 Cal.4th at p. 467) or more specifically because the special circumstances are so numerous or so broad (*People v. Yeoman, supra,* 31 Cal.4th at p. 165);

—For failing to require that the jurors be unanimous with respect to aggravating factors (*People v. Gray, supra,* 37 Cal.4th at p. 236);

—Due to the alleged overbreadth of section 190.3, factor (a), which permits the jury to consider the circumstances of the crime as an aggravating factor (*People v. Robinson, supra,* 37 Cal.4th at p. 655);

—For failing to require the jury to return written findings (*People v. Boyette, supra,* 29 Cal.4th at p. 466);

—For failing to require juror unanimity with regard to the aggravating factors (*People v. Boyette, supra,* 29 Cal.4th at p. 466);

—For failing to require that the jury find the aggravating factors were proved beyond a reasonable doubt, that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, or that death is the appropriate penalty beyond a reasonable doubt (*People v. Bell* (2007) 40 Cal.4th 582, 620 [54 Cal.Rptr.3d 453, 151 P.3d 292]);

—For failing to impose a burden of proof on either party, even if only proof by a preponderance of the evidence (*People v. Stanley, supra,* 39 Cal.4th at p. 964; *People v. Boyette, supra,* 29 Cal.4th at p. 466);

—For depriving defendant of a legitimate expectation of a state liberty interest within the meaning of *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227], by failing to apply Evidence Code section 520[14] and instruct the jury on some burden of proof for the penalty phase (*People v. Dunkle* (2005) 36 Cal.4th 861, 939 [32 Cal.Rptr.3d 23, 116 P.3d 494]);

—For failing to require intercase proportionality review (*People v. Bell, supra,* 40 Cal.4th at p. 621; *People v. Boyette, supra,* 29 Cal.4th at p. 467);

—For permitting the jury generally to consider unadjudicated criminal conduct as an aggravating factor[15] (*People v. Gray, supra,* 37 Cal.4th at p. 236) and, more specifically, for permitting the jury to consider such conduct without requiring it unanimously to find the prior conduct true beyond a reasonable doubt (see *People v. Fauber* (1992) 2 Cal.4th 792, 848 [9 Cal.Rptr.2d 24, 831 P.2d 249] ["the law does not require a unanimous finding as to any unadjudicated crime offered in aggravation"]; *People v. Avena* (1996) 13 Cal.4th 394, 429 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [law requires the jury be instructed it must find prior unadjudicated conduct true beyond a reasonable doubt]; *People v. Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279] (plur. opn. of Kaus, J.); *id.* at p. 60 (conc. opn. of Broussard, J.) [same]);

—For using "restrictive adjectives" such as the words "extreme" (see § 190.3, factors (d) & (g)) and "substantial" (*id.,* factor (g)) (see *People v. Perry, supra,* 38 Cal.4th at p. 319);

—For failing to specify which factors were aggravating and which were mitigating (*People v. Boyette, supra,* 29 Cal.4th at p. 466);

—For prefacing several factors with the phrase "whether or not" (*People v. Gray, supra,* 37 Cal.4th at p. 236);

—For violating defendant's right to equal protection by treating noncapital sentencing differently from capital sentencing (*People v. Lewis and Oliver,*

[14] Evidence Code section 520 provides: "The party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue."

[15] Defendant does not explain what *unadjudicated* criminal conduct was introduced against him at the penalty phase. As to prior *adjudicated* crimes, defendant waived a jury for the prior felony conviction allegations at the guilt phase, and the trial court found beyond a reasonable doubt that he had suffered two convictions for burglary, one for assault with a deadly weapon, one for possession of heroin, one for sale or transportation of a controlled substance, and one for being a felon in possession of a firearm. The jury was instructed at the penalty phase that it could consider these convictions and assign to them whatever weight it thought appropriate. (See § 190.3, factor (c).)

*supra*, 39 Cal.4th at p. 1067 ["The statutory scheme does not deny capital defendants the equal protection of the laws or any other constitutional right insofar as it does not contain disparate sentence review (i.e., comparative or intercase proportionality review)"]; *People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614] ["capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law"]);

—For failing to comply with "International Norms of Humanity and Decency" (see *People v. Bell*, *supra*, 40 Cal.4th at p. 621);

—In light of the abolition of capital punishment in Western Europe (*People v. Moon*, *supra*, 37 Cal.4th at p. 48).

We also conclude neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] nor *Ring v. Arizona*, *supra*, 536 U.S. 584, applies to California's capital sentencing scheme. (*People v. Gray*, *supra*, 37 Cal.4th at p. 237.) Although defendant contends California's capital sentencing scheme is "no different" than the Arizona scheme considered by the high court in *Ring*, we disagree. As we recently explained: " 'Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. ([*Ring*,] at p. 603 [122 S.Ct. at p. 2440].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt.' " (*People v. Bell*, *supra*, 40 Cal.4th at p. 620.)

Defendant also contends his sentence of death should be reversed because the jury's penalty determination was based in part on nonviolent offenses such as his drug-related crimes, as well as unadjudicated criminal activity such as his gang affiliation. His prior convictions for possession of heroin and sale or transportation of a controlled substance, though nonviolent, fall squarely within section 190.3, factor (c). (*People v. Livaditis* (1992) 2 Cal.4th 759, 776 [9 Cal.Rptr.2d 72, 831 P.2d 297].) In any event, he did not object to evidence of either his prior convictions or of his gang activities. Accordingly, he forfeited the claim. (*People v. Schmeck* (2005) 37 Cal.4th 240, 301 [33 Cal.Rptr.3d 397, 118 P.3d 451].)

### 11. *Challenge to the Method of Execution*

Defendant contends the statutorily prescribed methods of execution in California violate the federal Constitution in two ways. First, he contends the state "failed to comply with the statutory requirement that standards for lethal injection be established by the Department of Corrections [and Rehabilitation]," citing section 3604, subdivision (a). Second, he contends death by lethal injection constitutes cruel and unusual punishment. These issues are not cognizable on appeal "because alleged imperfections in the method of execution do not affect the validity of the death judgment itself. Defendant's attack on illegalities in the execution process that may or may not exist when his death sentence is carried out are premature." (*People v. Boyer, supra,* 38 Cal.4th at p. 485.)

### 12. *Cumulative Effect of Penalty Phase Errors*

Defendant contends that even if no single error occurring at the penalty phase requires reversal, the cumulative effect of such errors does so. Having found no legal errors occurring at the penalty phase, we reject this claim as well.

### 13. *Attempted Reservation of Rights*

Defendant finally asserts that he "incorporates herein all issues raised by motion, written or oral, during pretrial, post-trial hearings, or trial that are contained in the Reporter's and Clerk's Transcript as augmented." Defendant states he intends to "preserve all issues previously raised for this appeal, the related habeas [corpus] action, and any other court actions pertaining to this case." To the extent he intends to incorporate by reference all documents presented to the trial court without now urging any legal issue based on those documents, the attempt fails. (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20 [46 Cal.Rptr.3d 638] [improper to incorporate by reference documents from the trial court].) Moreover, subject to narrow exceptions (see *In re Harris* (1993) 5 Cal.4th 813 [21 Cal.Rptr.2d 373, 855 P.2d 391]), defendant's attempt to preserve unargued claims also fails. "When [an] issue could have been, but was not, raised on appeal, the unjustified failure to present it on appeal generally precludes its consideration on habeas corpus." (*In re Sakarias* (2005) 35 Cal.4th 140, 169 [25 Cal.Rptr.3d 265, 106 P.3d 931]; see *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513].) Finally, the mere fact appellate counsel has not raised every possible or conceivable issue does not, as defendant argues, establish that appellate counsel is ineffective. (*In re Robbins* (1998) 18 Cal.4th 770, 810 [77 Cal.Rptr.2d 153, 959 P.2d 311] [appellate counsel acts properly by presenting only the strongest claims instead of all conceivable claims].)

DISPOSITION

The guilt and penalty phase judgments are affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 22, 2007, and the opinion was modified to read as printed above.